IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-2828
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TOM SCHULTZ and JAMES CHAPLIN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

(March 10, 1994)

Before JOHNSON, GARWOOD, and JOLLY, Circuit Judges.

JOHNSON, Circuit Judge:

Defendants James Chaplin and Tom Schultz were charged in a seventeen-count indictment with criminal acts surrounding a bank fraud scheme. Although a jury found each man guilty of the charged offenses, the Government failed to proffer sufficient evidence of federal jurisdiction. We therefore reverse.

I. Facts and Procedural History

Defendants Chaplin and Schultz were charged along with a third man, Kenneth E. "Jason" Lothamer, with executing a scheme to defraud and submit false statements to Texas Commerce Bank-Sugar Land ("TCB-Sugar Land" or "the bank") in violation of 18 U.S.C. §§ 2, 371, 1014, 1344. Lothamer was the director, president, and sole shareholder of Construction International,

Limited of Texas ("CIL"), a company which provided environmental products to chemical companies, railroad companies, and hospitals. On October 1, 1987, Defendant Chaplin joined CIL to manage the hospital hazardous waste division of the company and to become CIL's chief financial officer ("CFO"). As CFO, Chaplin assisted Lothamer in obtaining loans from TCB-Sugar Land. According to Chaplin, Lothamer would provide information to Chaplin, who compiled that information for presentation to the bank. Based upon that information, TCB-Sugar Land extended to CIL a line of credit which aggregated to approximately $5,000,000.00.

Because the bank required collateral worth twice the amount of each loan, Lothamer would furnish the bank with invoices representing debts owed to CIL by various companies. Several of those invoices listed Dow Chemical Company and Rock Wool Insulation Company as owing CIL millions of dollars for thousands of feet of track pans.[1] Those invoices were completely fabricated by Lothamer. On the Dow Chemical invoices, he represented that the contact person was Barbara Nelson and listed her Dow Chemical telephone number. In actuality, that telephone number was a CIL number, and Lothamer instructed his secretary, Susan Pickford, to answer that telephone line as Barbara Nelson and to verify the Dow Chemical invoices in question. The other CIL employees were instructed never to answer that particular

---

[1]Track pans are fiberglass containers which are placed on railroad tracks to catch chemical substances which are wasted during the loading and unloading of railroad cars.

line.  Lothamer allegedly set up a similar system with Defendant Schultz.  Schultz owned fifty percent of Rock Wool Insulation Company.  That company, located in a Chicago, Illinois, suburb, installed fiberglass insulation.  It did not purchase or install track pans.  However, bank officials were able to verify the Rock Wool invoices for the purchase of track pans by calling Defendant Schultz on his "private line."  That line was actually Schultz's home telephone number.

This scheme unravelled in June of 1989, when the Sugar Land bank president could not reach Schultz to verify an invoice.  The president, Lewis Garvin, therefore obtained Rock Wool's office number by calling information.  Upon calling Rock Wool, Mr. Garvin learned for the first time that Rock Wool had not *ever* purchased track pans from CIL and, in fact, did not use track pans at all.  After failing in its attempts to obtain valid invoices or the repayment for the latest loan——worth approximately $1,000,000.00——TCB-Sugar Land involved the FBI.  On April 20, 1992, the Government filed a second superseding indictment against Lothamer, Schultz, and Chaplin, charging them with aiding and abetting,[2] conspiracy,[3] making false statements

---

[2]18 U.S.C § 2.

[3]18 U.S.C. § 371.

to an FDIC insured bank,[4] and bank fraud against an FDIC insured bank.[5]

Lothamer pled guilty just prior to his trial. Chaplin and Schultz received a joint jury trial. After the Government rested, Mr. Chaplin's counsel moved for acquittal, contending that the Government had not proved that TCB-Sugar Land was insured by the FDIC.[6] The Government had produced an FDIC insurance certificate not for TCB-Sugar Land, but for TCB-National Association. Counsel for the Government argued that bank officials had testified that the Sugar Land bank fell under the charter of TCB-National Association. The district court, accepting the Assistant U.S. Attorney's representations, denied Chaplin's motion. The jury found Chaplin and Schultz

---

[4]18 U.S.C. § 1014.

[5]18 U.S.C. § 1344. Congress amended this provision in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). FIRREA replaced the § 1344 requirement that the fraud be committed against a "federally chartered or insured financial institution" with the requirement that the fraud be committed against a "financial institution." While upon first impression this change might be construed as deleting the requirement that the bank be insured by the FDIC, upon closer review, we are convinced that that requirement is still viable. Among other things, 18 U.S.C. § 20 defines "financial institution" as "an insured depository institution" and refers readers to 12 U.S.C. § 1813(c)(2). Section 1813(c)(2) defines "insured depository institution" as any bank or savings association whose deposits are insured by the FDIC.
The superseding indictment in this case alleged that TCB-Sugar Land's deposits were insured by the FDIC, so no other definition of financial institution is relevant here. Indeed, the Government failed to prove that any other definition was applicable in this case.

[6]Counsel for Mr. Schultz also moved for acquittal, but on other grounds.

guilty, as charged, and the district court sentenced Chaplin to thirty-seven months' imprisonment on counts one and two and a concurrent twenty-four month prison term on the remaining counts. The court sentenced Schultz to twenty-seven months' imprisonment on counts one and two and a concurrent twenty-four month prison term on his remaining counts. Both men were held jointly and severally liable for restitution to Texas Commerce Bank in the amount of $1,003,076.85. Raising several points of error, Defendants Chaplin and Schultz appeal.

## II. Discussion

Each of the crimes for which the defendants have been convicted requires the Government to prove, *inter alia*, that TCB-Sugar Land was insured by the FDIC. As this Court has repeatedly and consistently stated, proof of FDIC insurance is not only an essential element of the bank fraud and false statement crimes, but it is also essential for the establishment of federal jurisdiction. *United States v. Slovacek*, 867 F.2d 842, 845 (5th Cir.), *cert. denied*, 490 U.S. 1094 (1989); *United States v. Trice*, 823 F.2d 80, 86 (5th Cir. 1987). Criminal defendants may therefore claim that the Government insufficiently proved the jurisdictional element post-verdict. *Trice*, 823 F.2d at 87. That Defendant Schultz failed to move for acquittal due to the insufficiency of the evidence of the jurisdiction issue is therefore of no moment. He did not waive the alleged jurisdictional error, and the applicable standard of review as to Schultz does not escalate to plain error. The insufficiency of

5

the evidence standard is applicable to both Schultz and Chaplin. That standard, though more lenient than the plain error standard, is still quite formidable. The Court must review all of the admissible evidence and the reasonable inferences which flow therefrom in a light most favorable to the verdict to determine whether a reasonable trier of fact could find that that evidence established guilt beyond a reasonable doubt. *Trice*, 823 F.2d at 86; *United States v. Maner*, 611 F.2d 107, 108-09 (5th Cir. 1980).

Here, the Government claims that the FDIC certificate of insurance for TCB-National Association, along with the testimony of two TCB-Sugar Land bank presidents and a TCB-Houston loan management vice-president sufficiently established that TCB-Sugar Land was insured by the FDIC. A review of that evidence follows.

Lanny Brenner, president and chief executive officer of TCB-Sugar Land from 1983 until February 1, 1988, testified that Texas Commerce Banks were grouped into six bank clusters. Although he did not list each of the banks which belonged to his cluster, Mr. Brenner testified that TCB-Stafford was the largest bank in the cluster and that he, along with the presidents of the other four smaller banks, answered to the president and CEO of TCB-Stafford. Mr. Brenner also stated that loans had to be approved by the Loan and Discount Committee, which was composed of the presidents of the six banks in his cluster.

After Mr. Brenner left TCB-Sugar Land, Lewis Garvin became president of the bank. The Government introduced into evidence reports addressed to the Loan and Discount Committee in which Mr.

6

Garvin requested approval of loans to CIL.  Several of the reports also requested that "TCB-Houston, Stafford Branch" or "TCB-Houston" participate in portions of the loans. Additionally, Mr. Garvin testified that after he became concerned about the bank's loans to CIL, he contacted the "Loan Management Department at the bank."  He specifically talked with Mark Harris, John Kaszynski, and Cheryl Pace.  Mr. Garvin neither explained the structure of the Loan Management Department nor identified "the bank" in which the department was located.  He intimated, however, that he was subordinate to that department.

Cheryl Pace, vice-president of the Loan Management Department, testified that that department operated out of the downtown location of TCB-Houston.  Ms. Pace testified that she began working for Texas Commerce Bank in 1980 and transferred to TCB-Houston in May 1987, "when branching became effective in Texas."  Ms. Pace confirmed that the chairman of TCB-Sugar Land was subordinate to the chairman of TCB-Stafford, who, according to Ms. Pace, was in charge of five banks in the southwest area. Ms. Pace also mentioned the "*branch* manager" of TCB-Sugar Land and intimated that all TCB banks were part of the same organization.

The Government argues that this evidence, coupled with TCB-National Association's FDIC insurance certificate, sufficiently established that TCB-Sugar Land was a branch of TCB-National Association and was covered by TCB-National Association's FDIC

7

insurance policy.[7]  Although we agree that the Government proved that TCB-Sugar Land was, in some way, related to TCB-Stafford, TCB-Houston, and to a larger, but nebulous, Texas Commerce Bank organization,[8] we find that the Government failed to prove that TCB-Sugar Land was insured by the FDIC——whether under TCB-National Association's policy or otherwise.

The FDIC insurance certificate and accompanying documents introduced into evidence conclusively refute the Government's contention that TCB-Sugar Land was a branch insured by TCB-National Association's insurance policy.  Those documents specifically set forth the history of TCB-National Association.  The Assistant Executive Secretary of the FDIC certified in writing that TCB-National Association was initially designated

---

[7]The Government also contends that one TCB-Sugar Land check, which contained an FDIC symbol and stated that deposits up to $100,000 were insured, proves beyond a reasonable doubt that the bank was insured by the FDIC.  We reject that contention.  An FDIC logo on a check no more proves beyond a reasonable doubt that the bank in question has FDIC insurance than a National Basketball Association logo on a jacket proves that its wearer is a professional basketball player.

Even if this Court were inclined to hold that an FDIC logo on a check sufficiently proves that a bank has FDIC insurance——and it is not so inclined——that holding would not benefit the Government here.  The Government introduced more than 1200 checks, numerous credit and deposit slips, and various other TCB-Sugar Land documents into evidence.  Only one check, amidst this voluminous record, contained the FDIC symbol.  Were we to adopt the Government's reasoning, we would be more inclined to rule that the *absence* of the FDIC symbol on the other multitudinous documents in this case raises the inference that TCB-Sugar Land was *not* insured, instead of ruling to the contrary.

[8]The Government did not elicit *any* testimony about TCB-National Association, let alone prove that TCB-National Association and TCB-Houston are one and the same.

"The National Bank of Commerce of Houston" and became a member of the FDIC on January 1, 1934. On January 17, 1964, The National Bank of Commerce of Houston consolidated with the Texas National Bank of Houston. The bank then became "Texas National Bank of Commerce of Houston." Finally, on January 20, 1970, the Texas National Bank of Commerce of Houston changed its corporate title to "Texas Commerce Bank National Association." FDIC documents support each of the Assistant Executive Secretary's statements.

Important for our purposes, the final FDIC document, dated January 30, 1970, specifically states that Texas Commerce Bank National Association *operates no branches*. The FDIC insurance certificate is also dated January 30, 1970. The Government introduced no document which reflected that TCB-National Association had added branches subsequent to January 30, 1970, or updated its bank control status after that date. Absent such documentation, this Court will not assume that TCB-National Association operated any branches in contravention to its FDIC records.[9]

---

[9]Federal statute and regulations require banks to notify the FDIC of changes in their control. They further require the FDIC to approve any such changes. 12 U.S.C. § 1817(j); 12 C.F.R. § 303.4 (1993). The Change in Bank Control Act became effective in 1964——six years before TCB-National Association assumed that name and 14 years before branch banking was allowed in Texas. *See* 12 U.S.C. § 1817 (Historical and Statutory Notes) (stating that subsection (j), the bank control notification section, was added in 1964). Additionally, FDIC records must affirmatively reflect bank control changes and the FDIC approval thereof. *See* 12 C.F.R. § 309.4(d)(2)(i) (providing that after the FDIC accepts a notice of a bank's change in control, records of the acceptance of the change, as well as information about the change, become available for public inspection).

Indeed, at the time that the 1970 FDIC certificate was issued––and none has apparently been issued since that time––branch banking was illegal in Texas. The Texas Constitution specifically provided that corporate bodies with banking and discounting privileges "shall not be authorized to engage in business at more than one place, which shall be designated in its charter." TEX. CONST. art. XVI, § 16, *amended* Aug. 23, 1937, Nov. 4, 1980; Nov. 6, 1984; Nov. 4, 1986. Under the McFadden Act, national banks could operate branches only to the extent that state banks could operate. 12 U.S.C. § 36(c). Because state banks were prohibited from engaging in branch banking, national banks were likewise prohibited.

While Ms. Pace, one of the Government's witnesses, testified that branch banking became effective in Texas in May of 1987, she no doubt was referring to a constitutional amendment passed by Texas voters in November 1986, which allowed branch banking in the city or county of the bank's domicile.[10] *See* TEX. CONST. art. XVI, § 16(e). Because TCB-Sugar Land is located in Sugar Land, Fort Bend County, and TCB-National Association is located in Houston, Harris County, TCB-Sugar Land could *not* have operated as a branch of TCB-National Association in May of 1987.

The Government points out that a federal district court ruled that national banks could begin branch banking in June of 1988. *Texas v. Clarke*, 690 F. Supp. 573 (W.D. Tex. 1988). The

---

[10]Until 1988, national banks only operated branches city-wide or county-wide. *Texas v. Clarke*, 690 F. Supp. 573, 575 (W.D. Tex. 1988).

10

Government is absolutely correct.  However, it did not introduce one shred of evidence which showed that TCB-Sugar Land became a branch of TCB-National Association subsequent to that decision.  In fact, no witness even mentioned the name "TCB-National Association," let alone connected TCB-Sugar Land with that organization.  Further, even if the Government had proved that the Sugar Land bank was a *branch* of the National Association bank, such evidence would have been insufficient to prove that TCB-Sugar Land was *insured* under TCB-National Association's FDIC insurance policy.  *See* 12 U.S.C. § 1817(j) (requiring notification of changes in bank control and acceptance by the FDIC of such changes); 12 C.F.R. § 303.4 (1993) (same).

The Government introduced the testimony of two TCB-Sugar Land bank presidents.  If those officials had possessed personal knowledge of the bank's insurance status, their testimony that TCB-Sugar Land was insured by the FDIC during the periods in question, if unchallenged, would have sufficiently proven the jurisdiction issue in the case *sub judice*.  *United States v. Slovacek*, 867 F.2d 842 (5th Cir.), *cert. denied*, 490 U.S. 1094 (1989); *United States v. Rangel*, 728 F.2d 675 (5th Cir.), *cert. denied*, 467 U.S. 1230 (1984).  For reasons unbeknownst to this Court, the Government chose not to elicit such testimony.  The testimony and evidence the Government did proffer——that TCB-National Association was insured by the FDIC——are patently insufficient to prove that TCB-Sugar Land was so insured, even though the two banks may have been related.  The Government

11

therefore failed to establish federal jurisdiction and prove each *prima facie* element of the charges lodged against Defendants Chaplin and Schultz.

This Court has continually cautioned the Government that its failure to adequately prove the jurisdiction element might one day require the reversal of bank fraud convictions.[11] *Maner*, 611

_____

[11]This Court has often warned that insufficient attention to the jurisdiction element might become the Government's nemesis. *See, e.g.*, *United States v. Harrill*, 877 F.2d 341, 344 (5th Cir. 1989) ("[W]e again caution the prosecution about the proof of the jurisdictional element required in these cases. There must be adequate proof that the accounts of the financial institution were insured at the time of the offense by the appropriate federal agency."); *Slovacek*, 867 F.2d at 846 ("There are numerous indications in our prior decisions that prosecutors appear to be indifferent to the fact that we have held that the jurisdictional requirement . . . is an essential element of the offense. Indeed, in some of these cases one searches in vain for any careful and intelligent effort to prove this element. We are aware that the offices of United States Attorneys frequently have a high turnover in personnel and limited resources. Nevertheless, we do not believe that this problem cannot be solved, especially when lack of sufficient proof of this element now compels reversal and dismissal of the indictment, not just remand for a new trial with better evidence." (internal quotation marks deleted)); *United States v. Platenburg*, 657 F.2d 797, 799 (5th Cir. 1981) ("Despite the fact that FDIC insured status is an express requirement of the applicable statutes, an essential part of a valid indictment, and an indispensible (sic) item of proof of an offense, prosecutors have been extremely lax in the treatment accorded this element. . . . [I]n *Maner* we moved from cautionary statements to a clarion call that the day would come when our reluctance to reverse on the issue of FDIC proof would be overcome . . . . The day has come; the line from sufficiency to insufficiency has been crossed.); *United States v. Brown*, 616 F.2d 844, 849 (5th Cir. 1980) ("We have difficulty comprehending why the Government repeatedly fails to prove this element more carefully since the Government's burden is so simple and straightforward." (quoting *Maner*, 611 F.2d at 112)); *Maner*, 611 F.2d at 112 ("[T]his [failure to carefully prove the jurisdiction element] is a nationwide plague infecting United States Attorneys throughout the land. Hopefully the Attorney General will sense and remedy this national deficiency by directions pointing out the simple ways to prove this simple but indispensable fact.").

12

F.2d at 112.  That day came in *United States v. Platenburg*, 657 F.2d 797 (5th Cir. 1981), in *United States v. Trevino*, 720 F.2d 395 (5th Cir. 1983), and it has likewise come today.[12]

### III.  Conclusion

For the above stated reasons, this Court REVERSES and REMANDS with instructions that the district court dismiss the charges against both defendants.  *See Burks v. United States*, 437 U.S. 1, 18 (1978) (holding that indictments must be dismissed when the Government fails to prove its case during trial).

---

[12]The Seventh and Ninth Circuits have likewise reversed convictions due to the Government's failure to prove that financial institutions were federally insured.  *United States v. James*, 987 F.2d 648 (9th Cir. 1993); *United States v. Shively*, 715 F.2d 260 (7th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984).