**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward Eugene ALLEN, Defendant–**
**Appellant.**

No. 94–30393.

United States Court of Appeals,
Ninth Circuit.

Argued Sept. 15, 1995.

Submission Deferred Sept. 15, 1995.

Submitted Oct. 2, 1995.

Decided July 3, 1996.

John E. Storkel, Storkel & Grefenson, Salem, OR, for defendant-appellant.

Sean B. Hoar, Assistant United States Attorney, Eugene, OR, for plaintiff-appellee.

Before: SCHROEDER, REINHARDT, and FERNANDEZ, Circuit Judges.

SCHROEDER, Circuit Judge:

Edward Allen appeals his conviction and sentence, following a jury trial, on thirty-five counts of making false statements in loan applications to two federally insured financial institutions, in violation of 18 U.S.C. § 1014. On appeal in a counseled brief and a pro se supplemental brief, he raises nineteen issues, of which three are decided in this opinion.[1] In this opinion we first consider Allen's challenges to his conviction on jurisdictional grounds. He contends that the government failed to prove that the two financial institutions, the Western Bank of Oregon ("Western Bank") and the Southern Oregon Federal Credit Union ("Southern Credit Union"), were federally insured at the time of the alleged criminal conduct. We then turn to his challenge to his sentence. He contends that the district court incorrectly calculated the losses resulting from his fraudulent conduct, and erroneously considered allegedly uncounseled convictions in its determination of his criminal history category. We vacate the convictions on two counts because the

---

1. The remaining issues are disposed of in an unpublished disposition, *United States v. Allen,* No. 94–30393, 91 F.3d 155 (9th Cir. July 3, 1996), decided today.

government's proof failed to establish the insured status of the credit union, but affirm the remaining counts. We conclude that there is no merit to Allen's challenges to the loss calculation, but in light of the two vacated counts, we vacate the sentence and remand for resentencing. We also remand for a hearing on the validity of the challenged prior convictions.

## FACTS

In June of 1988, Housing U.S.A., a mobile home dealership in Oregon, hired Edward Allen to sell mobile homes. Allen quickly became a manager. He completed purchase agreements with customers, helped them obtain financing, and submitted their financial information, including purchase agreements and credit applications, to Western Bank. In order to obtain financing from the bank, a mobile home customer had to make a down payment equal to twenty percent of the purchase price. Many of Allen's customers, however, could not satisfy this requirement. Consequently, he falsified purchase agreements to show a higher down payment. He also falsified credit applications for certain customers, so that they showed higher asset holdings.

Additionally, Allen made false statements on personal credit and loan applications submitted to Western Bank and Southern Credit Union. He falsely represented his birth date, social security number and bankruptcy status.

On June 28, 1993, Allen was arraigned in federal court on a fifty-two count indictment charging him with violations of 18 U.S.C. § 1014. On December 15, 1993, a grand jury returned a forty-seven count superseding indictment against Allen. On January 31, 1994, after trial by jury, Allen was found guilty on thirty-five counts. He received a total prison sentence of forty-six months.

## FEDERALLY-INSURED STATUS

Allen contends that the district court erred in denying his motion for acquittal because the government failed to prove that Western Bank and Southern Credit Union were federally insured at the time of his fraudulent conduct. He asserts that there was no evidence of insured status as of the time the fraudulent statements were made.

■ We review the district court's denial of a motion for acquittal in the same manner as a challenge to the sufficiency of the evidence. *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir.1989). Consequently, we review the evidence presented against Allen in the light most favorable to the government to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. James*, 987 F.2d 648, 650 (9th Cir.1993); *Shirley*, 884 F.2d at 1134 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)(emphasis in original)).

### A. The Southern Oregon Federal Credit Union

■ There was no direct testimony of the credit union's insured status as of the time the fraud was committed. The government offers three arguments in support of its position that the evidence was nevertheless sufficient. First, it argues that jurors could infer the credit union's federally insured status from the title, which includes the word "Federal." This court, however, rejected this very argument in *James*, 987 F.2d at 649–50, where we held that the "names of the banks," which included Home *Federal* Savings, were not in themselves sufficient to establish federally-insured status under 18 U.S.C. § 1014.

■ Second, the government argues that Southern Credit Union official Sunni Boyd's trial testimony establishes that the credit union was federally insured in 1988–89. It does not, because the testimony did not relate to the relevant time period. During the government's direct examination of Ms. Boyd, the following exchange took place:

Q. (By Mr. Hoar) And Ms. Boyd, is the Southern Oregon Federal Credit Union insured by the National Credit Union Administration?

A. Yes, it is.

Q. So it's a federally-insured credit union?

A. Yes.

The problem with this testimony is that it took place during trial in January, 1994. Boyd answered the prosecutor's questions in the present tense. Thus, while her testimony may establish the credit union's insurance status in 1994, it does not establish that the credit union was insured when Allen made his fraudulent statements in 1988–89.

The government responds by arguing that the above exchange took place during questioning about a 1989 transaction involving defendant Allen, and that during the exchange the jury had before it an exhibit documenting the 1989 transaction; therefore, jurors could reasonably infer that the credit union was federally insured in 1989. We reject the government's argument. Boyd's present-tense answers simply do not support the inference that Southern Credit Union was federally insured at the time of the offenses, some four and a half years earlier.

■ Third, the government points to testimony by Kenneth Agee, who was employed by Housing U.S.A.'s parent company between 1987 and 1990, which includes the period of Allen's fraudulent behavior. Agee, whose testimony was preceded by several days of testimony from other witnesses about mobile home loans from Western Bank and the Southern Federal Credit Union, testified to the following:

Q. With regard to these ads, isn't it true that Shadow Ranch actually sought financing through companies that weren't—that were non-bank institutions, like Greentree, WESAV, nonfederally-insured agencies or companies? Is that right?

A. Yes, that's correct.

Q. And so with regard to down payments with some of those other companies, they may not have the same requirements as a federally insured institution? Correct?

A. Well those lenders all require down payments of some sort. . . .

Agee's testimony is not sufficient. While he may have meant to distinguish Southern Credit Union from his examples of non-insured financial institutions, he never referred specifically to the Southern Credit Union. He similarly makes no mention of whether Edward Allen's transactions involved insured institutions. Agee's testimony, thus, falls short of the quantum of evidence necessary to prove an element of a crime.

We must accordingly vacate Allen's conviction on counts twenty-one and forty-seven, the only counts involving the credit union.

## B. The Western Bank of Oregon

■ There was no direct testimony of insured status of the bank either. The government relies on three pieces of evidence in opposition to the motion for acquittal regarding counts involving Western Bank: testimony from Western Bank official Kenneth Williams, the testimony from Kenneth Agee excerpted above, and two exhibits containing the words "member FDIC." Unlike the counts involving Southern Credit Union, the government has proved, if only by a thin margin, Western Bank's insurance status.

Neither Williams' nor Agee's testimony offers the government any assistance. Williams' testimony about Western Bank's insurance status suffers from precisely the same defect as Boyd's testimony. Agee's testimony, as discussed above, is equally unhelpful.

Thus, the government's case rests on exhibits 6e and 16d. On exhibit 6e, a document entitled Individual Financial Statement and relating to a loan transaction on November 1, 1988, the words "HEAD OFFICE COOS BAY OREGON MEMBER FDIC," as we view the document, clearly and legibly appear next to the Western Bank insignia at the top of the document. On exhibit 16d, a Western Bank loan employment verification form dated March 2, the words "Member FDIC" appear at the bottom of the page. While this document does not contain a year date, one can infer from the information contained therein that the form was completed in 1989. These two exhibits constitute the only evidence that Western Bank was federally insured at the time of Allen's fraudulent conduct in 1988–89. When we view these exhibits in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Western Bank was federally insured at the time of Allen's fraudulent behavior. Therefore, the district court did not err

in denying the motion for acquittal on the thirty-three counts involving Western Bank.

## CALCULATION OF THE LOSSES

█ Allen claims that the district court erred when it calculated the bank's and credit union's losses without considering payments made before default, interest income from non-defaulting loans, and payments made on outstanding loans. We review the district court's interpretation of the Sentencing Guidelines *de novo,* and its factual findings for clear error. *United States v. Buenrostro–Torres,* 24 F.3d 1173, 1174 (9th Cir. 1994).

█ The offense level assessed for offenses involving fraud varies with the amount of the "loss" occasioned by the offender. *See* U.S.S.G. § 2F1.1(b)(1). "Loss" is calculated using the greater of the "intended loss" or the "actual loss." U.S.S.G. § 2F1.1, commentary (n.7)(1993); *United States v. Galliano,* 977 F.2d 1350, 1352 (9th Cir.1992), *cert. denied,* 507 U.S. 966, 113 S.Ct. 1399, 122 L.Ed.2d 772 (1993). If the defendant has no intent to repay or otherwise make good on the loan, then the "intended loss" is the gross value of the loan taken from the bank. *United States v. Hutchison,* 22 F.3d 846, 855 (9th Cir.1993); *Galliano,* 977 F.2d at 1353. The court need not examine the actual loss because the intended loss is the maximum loss. *Galliano,* 977 F.2d at 1353. *United States v. Wills,* 881 F.2d 823, 827 (9th Cir.1989). If, however, the defendant intended to make good on all or part of the loan, then the "intended loss" is less than the gross value; and, the actual loss incurred by the victim is used to calculate the amount of loss if it is greater than the intended loss. *Galliano,* 977 F.2d at 1353 (citing, *United States v. Schneider,* 930 F.2d 555, 559 (7th Cir.1991); *United States v. Kopp,* 951 F.2d 521, 536 (3rd. Cir.1991), *United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir.1991), and *United States v. Rothberg,* 954 F.2d 217, 219 (4th Cir.1992); *United States v. Shaw,* 3 F.3d 311, 312–13 (9th Cir.1993)). The parties agree that at issue here are Western Bank's actual, rather than intended, losses.

The 1991 amendments to the Sentencing Guidelines explained the factors a court should consider when calculating actual loss. Note 7 of the commentary to § 2F1.1 specifies that for fraudulent loan applications,

the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan *not repaid* at the time the offense is discovered, reduced by the amount the lending institution has *recovered* (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used. U.S.S.G. § 2F1.1, commentary (n.7(b))(1993)(emphasis added).

█ This court has not had occasion to determine how actual losses should be calculated in the case of fraudulent loan applications. *United States v. Hutchison,* 22 F.3d at 855 (intended loss, rather than actual loss, applies because defendant did not intend to repay the loans); *Galliano,* 977 F.2d at 1353 (same). However, other courts that have considered this calculation after the amendments, have held that "actual loss" must take into account the amount recovered or reasonably anticipated to be recovered from collateral that secured the loan, and loan payments made prior to default. *Rothberg,* 954 F.2d at 219; *United States v. Baum,* 974 F.2d 496, 499 (4th Cir.1992); *Smith,* 951 F.2d at 1167–68; *Kopp,* 951 F.2d at 535.

█ The district court in this case found the minimum loss to be $70,255.75. The court did not explain how it arrived at this figure, but the record reveals that it derived this figure from witness Judy Dupell's testimony. Dupell, an accountant, testified that with regard to the defaulting loans, the gross loan value totaled $170,412.68; the proceeds realized from repossession and resale of the mobile homes equaled $100,156.93; and the loan payments made prior to default totaled $54,989.15. The court properly subtracted the resale proceeds from the gross loan value and arrived at $70,255.75.

Allen argues that the district court should also have subtracted the $54,989.15 of loan payments made prior to default when it cal-

culated the actual loss, thereby reducing the actual loss to $15,266.60. However, the record reflects that these loan payments were credited by the bank towards interest, not principal. The district court was not asked to include the accrued interest as part of the actual loss calculation, although several circuits have approved the practice. *See United States v. Gilberg,* 75 F.3d 15, 19 (1st Cir.1996)(accrued interest included in the loss calculation under § 2F1.1); *United States v. Henderson,* 19 F.3d 917, 928 (5th Cir.)(same), *cert. denied,* —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 137 (1994); *United States v. Jones,* 933 F.2d 353, 354–55 (6th Cir.1991)(same); *United States v. Allender,* 62 F.3d 909, 917 (7th Cir.1995)(same), *cert. denied,* —— U.S. ——, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996); *United States v. Lowder,* 5 F.3d 467, 471 (10th Cir.1993)(same); *contra United States v. Hoyle,* 33 F.3d 415, 419 (4th Cir.1994)(loss calculation under § 2F1.1 should not include accrued interest), *cert. denied,* —— U.S. ——, 115 S.Ct. 949, 130 L.Ed.2d 892 (1995). In this case, had the district court included the accrued interest, then interest payments made prior to default would have been taken into account. *See* U.S.S.G. § 2F1.1 comment. (n.7(b)) ("the loss is the amount of the loan not repaid ..."); *Rothberg,* 954 F.2d at 219; *Baum,* 974 F.2d at 499; *Smith,* 951 F.2d at 1167–68; *Kopp,* 951 F.2d at 535. However, the district court used only the loan principal to calculate the "amount of the loan;" it did not consider the accrued interest. Therefore, payments made towards interest cannot be considered as repayments made on the loan. The district court correctly excluded the $54,989.15 in interest payments from the loss calculation.

■ The district court also refused to consider the interest proceeds from the non-defaulting loans. Allen argues that the court should have considered the interest income from these loans on the theory that it is inconsistent to aggregate the losses from defaulting loans and ignore the gains from non-defaulting loans. The district court correctly rejected this argument. Its calculations in this regard were fully consistent. The district court did not include as part of the loss the interest income the bank lost as a result of default, and therefore did not set off against the loss the interest income received from non-defaulting loans. Contrary to defendant's argument, it is the lost interest income associated with the defaulting loans, not the amount of the unpaid principal, that is the counterpart of the interest income derived from the non-defaulting loans. The interest income lost on the defaulting loans is not included. Therefore, interest income from the non-defaulting loans should not be included either.

■ The district court also correctly refused to include payments made on the thirteen loans that remain outstanding. For these loans, there is a risk of default that may offset the amount of income collected now and in the future. If this risk cannot be accurately estimated and included in the loss calculation, then the income should not be considered. *See Smith,* 951 F.2d at 1169; *United States v. Hughes,* 775 F.Supp. 348, 351 (E.D.Cal.1991). The district court found that the future losses and profits were too speculative to consider. This finding is not clearly erroneous. Thus, the district court correctly refused to consider the loan payments made on the thirteen outstanding loans.

In sum, the district court correctly calculated the loss for purposes of § 2F1.1. The actual loss should be reduced only by the amount of loss to the credit union erroneously included in the convictions based on counts twenty-one and forty-seven, since we vacate those convictions for lack of sufficient evidence of insured status.

### UNCOUNSELED CONVICTIONS

■ Defendant contends that the district court erred in its calculation of his criminal history because it included prior convictions where he was denied his Sixth Amendment right to counsel. Those convictions, however, have apparently not been previously collaterally challenged. We review *de novo* the district court's interpretation of the Sentencing Guidelines and its determination that a prior conviction may be used in computing a defendant's sentence. *United States v. Young,* 988 F.2d 1002, 1003 (9th Cir.1993).

■ The version of the sentencing guidelines applicable in this case neither authorizes nor prohibits defendant's challenge to the use of contested prior convictions. Note 6 of § 4A1.2 prohibits the district court from including in a defendant's criminal history score sentences resulting from convictions that "(A) have been reversed or vacated because of errors of law or because of subsequently discovered evidence exonerating the defendant, or (B) have been ruled constitutionally invalid in a prior case." U.S.S.G. § 4A1.2 Note 6 (1993). It then states that the guidelines and commentary "do not confer upon the defendant any right to attack collaterally a prior conviction or sentence beyond any such rights otherwise recognized in law." *Id.* Thus, the guidelines neither authorize nor prohibit challenges to the use of prior convictions for determining criminal history. The courts, however, have drawn from the Sixth Amendment a right to make such challenges.

■ In *Custis v. United States,* 511 U.S. 485, ——————, 114 S.Ct. 1732, 1735–38, 128 L.Ed.2d 517 (1994), the Supreme Court held that at the sentencing hearing, a defendant may challenge the constitutionality of prior state convictions on the ground that he was denied his Sixth Amendment right to counsel. However, a defendant may not, during sentencing proceedings, collaterally attack prior convictions on any other grounds. *Custis,* 511 U.S. at ——, 114 S.Ct. at 1734.

Defendant Allen challenges the district court's determination of his criminal history because it included three 1976 and two 1991 state convictions that he claims were obtained in violation of his Sixth Amendment right to counsel. Certified copies of Allen's 1976 convictions have a blank in the space reserved for the name of the counsel. There is no indication that counsel was waived. Similarly, certified copies of his 1991 convictions state on their face that Allen argued pro se, but leave blank the box indicating that counsel was waived.

Allen objected to the inclusion of these convictions in his criminal history during his sentencing hearing. The certified copies of the convictions on their face support Allen's position that the convictions were uncounseled. The government points out that the presentence report says that defendant waived counsel on each of the challenged convictions. The report gives no reason for reaching that conclusion. The government also relies on the district court's rejection of defendant's challenge because his convictions were affirmed on appeal.

■ The government's position has no basis in this record or in controlling law. A probation officer's statements in a presentence report in and of themselves cannot be conclusive on the constitutionality of a prior conviction; affirmance on direct appeal does not preclude a defendant from mounting a collateral attack on an uncounseled conviction during a sentencing hearing. *See Custis,* 511 U.S. at ——-——, 114 S.Ct. at 1737–38; *Brown v. United States,* 610 F.2d 672, 675 (9th Cir.1980); *Farrow v. United States,* 580 F.2d 1339, 1346–48 (9th Cir.1978)(en banc). The court incorrectly refused to hold a hearing to determine the validity of defendant's claim. We remand for the district court to consider any relevant evidence the parties present.

## CONCLUSION

We vacate Allen's conviction on counts 21 and 47, involving fraudulent statements made to the Southern Credit Union, for failure to prove the jurisdictional element of federal insurance, and affirm the remaining counts of conviction. We therefore vacate Allen's sentence and remand for resentencing on the remaining counts. Finally, we remand for a sentencing hearing on Allen's Sixth Amendment claim, and for resentencing consistent with the outcome of that hearing.

AFFIRMED IN PART; REVERSED AND VACATED IN PART, and REMANDED FOR RESENTENCING.

REINHARDT, Circuit Judge, concurring in part, dissenting in part:

The government charged Allen with making false statements in loan applications to federally insured financial institutions, in violation of 18 U.S.C. § 1014. Proof of federal insurance, therefore, not only was essential to "the establishment of federal jurisdiction,"

*United States v. Schultz,* 17 F.3d 723, 725 (5th Cir.1994), but it also constituted an essential element of the offense, *see United States v. Bellucci,* 995 F.2d 157, 160 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2719, 129 L.Ed.2d 844 (1994). Having failed to point to any evidence establishing the essential element of federal insurance during the trial or at oral argument, the government was afforded a final opportunity to identify that evidence in a supplemental brief that this court requested. As far as I am concerned, our solicitude proved of no assistance to the government because, after considering its supplemental briefing, I still believe that the government failed to carry its burden with respect to an element of the offense not only as to the two counts involving the Southern Federal Credit Union, as the majority concludes, but also as to the thirty-three counts involving the Western Bank of Oregon. I, therefore, dissent.

The government's "proof" that the Western Bank of Oregon was federally insured consists of two forms: exhibits 6–e and 16–d, a loan transaction and a loan employment verification form. The first form, Exhibit 6–e, can be given no weight. It states, as the majority notes, "HEAD OFFICE COOS BAY OREGON MEMBER FDIC," and is all but illegible. The government asserts that the form was displayed on an overheard screen. We have no way of knowing, however, whether the exhibit was any more legible when so displayed. In all likelihood, it was not. In any event, to the extent that one can decipher the exhibit's message, it is highly ambiguous. It is unclear that any juror would have understood that the particular branch involved in this case, and not just the head office, was federally insured.

In actuality, then, it is the second form, Exhibit 16–d, that represents the sum total of the government's evidence. Although the form states "Member FDIC" in small print at the bottom of the page, it is not dated. The majority concludes that one could infer that the form was completed in 1989. The government itself did not draw this inference, however, and one can only wonder whether any juror would have done so on his own. In the end, the government's evidence

proving that the bank was federally insured during the relevant time period boils down to a form the significance of which would in all likelihood escape most, if not all, jurors.

I do not believe that the second form, even when viewed in the light most favorable to the government, is sufficient to establish, beyond a reasonable doubt, what is both an essential element of the offense and a jurisdictional requirement. This is particularly true, in my view, because the government did not at the time of trial even consider this thin reed to constitute evidence that was relevant to or probative of the issue of federal insurance and never advised the jury that it constituted such evidence. At trial, the government never once suggested that somewhere in the exhibits submitted to the jury lay the proof of federal insurance. Instead, the government relied exclusively on the testimony of a bank officer to establish that critical element of the offense—evidence that the majority properly concludes is of no relevance and of probative value. Only when this court afforded the government a final opportunity to sift through the record did it discover the form on which the majority rests its decision. Because the government never argued to the jury that the form tended to establish the existence of federal insurance, it is highly unlikely that any juror considered, or could have considered, it probative on that issue. Accordingly, I must disagree with my colleagues in the majority: I conclude that no reasonable juror could have found that the government proved the element of federal insurance beyond a reasonable doubt. *See United States v. James,* 987 F.2d 648, 650 (9th Cir.1993).

We should not affirm a conviction when the government has so cavalierly failed to prove an essential element of the offense, particularly where that element is so easily proven, and the government has been previously warned of the consequences of its negligent conduct. As the Fifth Circuit forcefully stated with respect to the government's attitude toward proving the existence of FDIC insurance:

Certainly we recognize the possibility that we or our sister Courts may some day be faced with an insufficiency of the evidence

774

of insurance ... which would warrant reversal. Indeed, we have difficulty comprehending why the Government repeatedly fails to prove this element more carefully since the Government's burden is so simple and straightforward. As in the other cases we have discussed, the Government treads perilously close to reversal in this case, and may soon find itself crossing the line from sufficiency to insufficiency.

*United States v. Platenburg,* 657 F.2d 797, 799 (5th Cir.1981) (citation omitted). *See Schultz,* 17 F.3d at 727 n. 11 (noting that the Fifth Circuit "has often warned that insufficient attention to the jurisdiction element might become the Government's nemesis"). In our own circuit, the day the government crossed the line came once before, in *James.* Still, the government, for some unexplained reason, persists in ignoring the need to prove an essential element of the offense. We should not now suddenly retreat from the principle we have so carefully tried to establish in order to rescue an improper and unjustifiable conviction.

The sufficiency of the evidence standard is generous, but not limitless. Accordingly, while I concur with respect to counts 21 and 47, I would reverse the convictions as to the remaining thirty-three counts, and therefore dissent as to those counts.