UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert E. LADUM; Ronald D. Van Vliet;
Daniel Hong; Echols Doyle Ford; David
C. Grigonis; James R. Weaver, Defen-
dants–Appellants.

Nos. 97–30018, 97–30019, 97–30022, 97–
30027, 97–30030 and 97–30044.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1998.

Decided April 17, 1998.

Robert Goffredi, Portland, Oregon, for Ford.

Lawrence Matasar, Portland, Oregon, for Hong.

Daniel Feiner, Portland, Oregon, for Ladum.

· Robert Reid, Portland, Oregon, for Van Vliet.

John Ransom, Portland, Oregon, for Weaver.

John Storkel, Salem, Oregon, for Grigonis.

Claire M. Fay and Kent S. Robinson, Assistant U.S. Attorneys, Portland, Oregon, for plaintiff–appellee.

Before: FERNANDEZ, RYMER, and TASHIMA, Circuit Judges.

Opinion By Judge RYMER; Dissent by Judge TASHIMA.

RYMER, Circuit Judge:

Robert Ladum, Echols Ford, David Grigonis, Daniel Hong, Ronald Van Vliet, and James Weaver appeal their jury convictions and sentences on various tax fraud, bankruptcy fraud, and money laundering charges in connection with the operation of seven second-hand stores around Portland, Oregon. Their appeal raises numerous issues relating to the sufficiency of the indictment, the suppression of statements, the sufficiency of the evidence, and the district court's sentencing determinations. In part, we must decide whether a defendant may still be prosecuted for non-coercive witness tampering under 18 U.S.C. § 1503, or whether that conduct now falls solely under 18 U.S.C. § 1512. We hold that § 1503 continues to cover such tampering. We have jurisdiction, 18 U.S.C. § 3741(a)(1) and 28 U.S.C. § 1294, and although we remand for resentencing as to Ford, we otherwise affirm.

I

Robert Ladum opened and operated seven second-hand stores in Portland, Oregon during the 1980's and early 1990's. The first store, The Hock Shop, later renamed Abe's, opened in 1983. The other stores were: Dave's Shop, opened in 1983; The Money Man, opened in 1985; Columbia Cash, opened in 1986; The Money Pit, opened in 1987; Union Cash, opened in 1987; and Division Cash, opened in 1988. Ladum concealed his ownership interests in these stores so he could avoid paying taxes on their income by using nominees who held themselves out as owners of the stores. The nominees would pretend to be the store owners by placing the title documents, business paperwork, and federal firearms licenses in their names. Nonetheless, Ladum would retain control of the nominee and the business. In meetings with nominees, Ladum discussed reporting of taxes and techniques to deal with law enforcement. Ladum told the nominees not to keep any records of income, not to report his cut on their tax returns, and to report only enough income to cover living expenses.

Echols Ford, Daniel Hong, Ronald Van Vliet, and James Weaver were nominees of different second-hand stores at various times. Ford, Hong, and Van Vliet filed tax returns as though they were the sole proprietors of the stores. All filed Schedule C's rather than K–1 forms and partnership returns that would have disclosed Ladum's interest. Additionally, these tax returns significantly understated income. The nominees had slightly different arrangements with Ladum, but typically, Ladum would provide start-up costs and inventory. After those costs were repaid, Ladum and the nominee would split net profits of the store, with Ladum receiving the larger share.

In an effort to thwart the IRS, Ladum instructed the nominees to be as obstructive as possible and to refuse to give information to officials. When they were approached by IRS agents, both Hong and Van Vliet falsely stated that they were the sole owners of their respective stores. Once Ladum became aware of the grand jury investigation in 1993, Ladum advised nominees to lie to the grand jury. He also approved of plans to alter records.

Between 1985 and 1988, Ladum acquired the real properties where Columbia Cash, The Money Man, The Money Pit, Union Cash, and Division Cash were located. With the help of Weaver, a part-time real estate

agent, David Grigonis acted as the nominee for the real properties. Although Grigonis used Ladum's money to purchase the real properties, he placed title in his own name. On his tax returns, Grigonis claimed sole ownership of the real properties and all income and expenses associated with these locations. Ladum's tax returns never reflected any income or expenses from the second-hand stores nor the real properties.

Between 1987 and 1989, Ladum used over $375,000 in profits from the second-hand stores secretly to purchase and remodel the Wallowa Lake Lodge, a rustic hotel in Joseph, Oregon. Much of the purchase price was traced to cash that had passed through the hands of various nominees. Grigonis purportedly spent $78,800, Ford $14,584. None of these contributors received a refund of his investment when the lodge was sold in 1990.

In 1988, Ladum declared bankruptcy, omitting from his petitions the second-hand stores, the real property where they were located, and the Wallowa Lake Lodge. After Ladum received a discharge in bankruptcy in May 1990, both Ladum and Grigonis continued to hide the ownership of the stores by having nominees write rent checks to Grigonis who would then use the funds to make mortgage or contract payments on the properties housing those businesses. This arrangement perpetrated the fiction that Grigonis owned the stores.

In June 1995, the grand jury issued a second superseding indictment charging all defendants in Count 1 with conspiracy to defraud the United States by impeding, impairing, obstructing, and defeating the IRS in the ascertainment, computation, assessment, and collection of Ladum's income tax, by deceitful and dishonest means in violation of 18 U.S.C. § 371. Additionally, Ladum was charged with aiding and assisting in the preparation of false income tax returns, filing a false income tax return, obstruction of justice and aiding and abetting, bankruptcy fraud, money laundering, and forfeiture. Grigonis was charged with filing false income tax returns, making false statements, bankruptcy fraud, money laundering, and forfeiture. Weaver was charged with making a false statement, and obstruction of justice and aiding and abetting. Ford was charged with filing false income tax returns, and obstruction of justice and aiding and abetting. Hong and Van Vliet were both charged with filing a false income tax return and making a false statement.

Prior to trial, the court dismissed the false statement charges against Hong and Weaver. Additionally, the court granted Ford's motion for judgment of acquittal on the obstruction of justice charge. The jury then found all defendants guilty on the conspiracy charge. Ladum, Ford, Hong, and Van Vliet were found guilty of all other charges. Grigonis was convicted of bankruptcy fraud and money laundering but acquitted on charges of filing a false income tax return and making a false statement. Weaver was acquitted of obstruction of justice. The jury also voted to forfeit the properties held by Grigonis as nominee for Ladum.

## II

■ Van Vliet argues that Count 16, which charges him with making a false statement in violation of 18 U.S.C. § 1001, should have been dismissed for failure to allege materiality. We review challenges to the sufficiency of an indictment de novo, *United States v. Dischner*, 974 F.2d 1502, 1518 (9th Cir.1992), and we reject Van Vliet's challenge.

■ Materiality is an essential element of a false statement charge under § 1001. *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir.1989) (en banc). An indictment's failure to allege materiality, however, will not necessarily render the indictment insufficient. *United States v. Oren*, 893 F.2d 1057, 1063 (9th Cir.1990). "[A]n indictment need not allege the materiality of a false representation if the facts advanced by the pleader warrant the *inference of materiality.*" *Id.* (quoting *Dear Wing Jung v. United States*, 312 F.2d 73, 75 (9th Cir.1962)). "A statement is considered material if it has the propensity to influence agency action...." *Facchini*, 874 F.2d at 643. Actual influence on agency action is not required; rather, "a court must consider whether a statement could, under some set of foreseeable circum-

stances, significantly affect an action by a federal department or agency." *Id.*

■ Count 16 of the indictment alleges that Van Vliet violated 18 U.S.C. § 1001 by: willfully and knowingly mak[ing] and caus[ing] to be made false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States by telling IRS Special Agent Michael Maney that he had no partners and had been the sole owner of DIVISION CASH for two years since January 1988; whereas, as defendant ROBERT D. VAN VLIET then and there well knew and believed defendant ROBERT E. LADUM had an ownership interest in DIVISION CASH since it began operating in January 1988.

This raises an inference of materiality as Van Vliet's concealment of Ladum's ownership of the business could significantly affect the IRS's effort to monitor and verify Ladum's tax liability. *See United States v. Carrier,* 654 F.2d 559, 561–61 (9th Cir.1981) ("No" response to inspector who inquired whether traveller was carrying more than $5,000 in cash was material because response would have a tendency to prevent Customs from fulfilling its administrative duty to require persons to file currency reporting forms.); *see also United States v. Mittelstaedt,* 31 F.3d 1208, 1221 (2d Cir.1994) (failure to disclose partnership interest is material). Despite the fact that the indictment does not allege the context in which the statement was made; whether Van Vliet, Ladum, or Division Cash are taxable entities; or whether ownership questions had any nexus to tax issues, it still raises an inference of materiality given that most people are taxable entities and ownership interests in property invariably affect taxes.

### III

Hong, joined by Van Vliet and Ford, argues that charges of filing a false return in violation of 26 U.S.C. § 7206(1) should have been dismissed for failure to state an offense. Hong was charged in Count 10 with filing a tax return, Form 1040, "which said return he did not believe to be true and correct as to every material matter in that the return and accompanying Schedule C reported that the business COLUMBIA CASH was a sole proprietorship owned by defendant HONG, and that HONG had received all the net income of the business; whereas he then and there well knew and believed that he ... was not the sole proprietor of COLUMBIA CASH and that ROBERT E. LADUM received income from COLUMBIA CASH."

■ He contends that § 7206(1) does not apply to a false Schedule C because Schedule C's are not authorized or required by any statute or regulation. Although there is no explicit requirement in the regulations for the completing and filing of a Schedule C, required Form 1040 directs the person filing it to attach a Schedule C to report business income or loss. It is implicit in Form 1040 that such schedules, when appropriate, become integral parts of the 1040, thereby bringing the Schedule C within § 7206. *See United States v. Damon,* 676 F.2d 1060, 1064 (5th Cir.1982); *United States v. Edwards,* 777 F.2d 644, 652 (11th Cir.1985); *see also United States v. Franks,* 723 F.2d 1482, 1483 (10th Cir.1983) (§ 7206(1) may be applied to any attachment to or question on a tax return).

■ Hong also argues that his Schedule C is literally correct, and that therefore, he cannot be guilty of making a false statement, regardless of the implication raised by his filing a Schedule C. He argues that, at worst, he filed the wrong form and that such conduct does not constitute filing a false return. We also disagree with this argument, which is premised on *United States v. Reynolds,* 919 F.2d 435 (7th Cir.1990), and *United States v. Borman,* 992 F.2d 124 (7th Cir. 1993). In both *Reynolds* and *Borman,* the defendants had failed to report certain types of income on their tax forms. The defendants in both cases argued that they had not violated 26 U.S.C. § 7206(b) because their tax forms were literally true and correct as those forms had not inquired about the non-reported income. The government's theory was that "the filing of Form 1040A implicitly represented that they received no income of a type or amount which would require the use of a different form." *Borman,* 992 F.2d

at 126. The court rejected the government's argument, holding that "the untruth must be found in a statement of some material information called for by the form itself, and any implication drawn from the filing of a particular form-that the taxpayer had received no income requiring the use of a different form-is simply not enough." *Id.*

Hong contends that, similar to *Reynolds* and *Borman,* his Schedule C and 1040 are literally correct. He notes that the first line of the Schedule C requests "Name of proprietor," and that he wrote "Daniel Hong" in response. He points out that the form did not ask, "Are you a sole proprietor?" He argues that he cannot be guilty of making a false statement under § 7206(1), regardless of the implication raised by his filing of a Schedule C, because using the wrong form does not violate § 7206(1).

We need not decide whether simply using the wrong form may ever constitute a violation of § 7206(1) because, in this case, Hong did more than just use the wrong form. First, line 13 of Hong's Form 1040 instructed him to attach a Schedule C for business income or loss. "Profit or (Loss) From Business or Profession (Sole Proprietorship)" is written at the top of Schedule C. The Schedule C then states: "Partnerships, Joint Ventures, etc., Must File Form 1065." Given the explicit instructions on the top of the page, by listing Daniel Hong as the proprietor, Hong affirmatively represented that he was a sole proprietor of Columbia Cash.[1]

In addition, Schedule C, line 31 requested "Net profit or (loss)." Hong wrote 4,983 in this box. After transferring this figure, along with the figure from another Schedule C, to line 13 of his 1040, he then used this figure in calculating line 30 on his form 1040. Form 1040, line 30 states: "This is your adjusted gross income." Because 4,983 represented all of the income distributed by Columbia Cash, and Hong had received only a percentage of the income from Columbia Cash, the figure represented in line 30 was not actually all of Hong's adjusted gross income.

Finally, line 17 of Hong's 1040 states "Rents, royalties, partnerships, estates, trust, etc. (attach Schedule E)." Because Columbia Cash was a partnership, Hong violated § 7206(1) by not filling in line 17. *See United States v. Mattox,* 689 F.2d 531, 533 (5th Cir.1982) ("Leaving a blank is equivalent to an answer 'none' or a statement that there are no facts required to be reported.... If there are facts that should be reported, leaving a blank belies the certification ... that the information therein is true and correct.") (internal quotations omitted); *see also Borman,* 992 F.2d at 126.

Thus, the indictment properly charged Hong, Van Vliet, and Ford with filing returns under penalties of perjury that they did not believe to be true and correct as to every material matter.

## IV

█ Hong argues that the district court erred in denying his motion to suppress his statements. We disagree. Hong told IRS agents on April 26, 1990, while they were executing a search warrant on Columbia Cash, that he had bought Columbia Cash from Heinze, that Hong was the sole owner, and that Ladum had nothing to do with the business. During pretrial proceedings, the government agreed not to introduce as evidence in its case in chief any items seized pursuant to that warrant. The government stipulated that the evidence would be treated as if it had been suppressed, and that "the government's position on the 1990 search is that we had a bad warrant, and the warrant was bad because it was overbroad." Hong argues that the statement should have been suppressed as an illegal fruit of the unconstitutional search.

█ Indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. *New York v. Harris,* 495 U.S. 14, 19, 110 S.Ct. 1640, 1643–44, 109 L.Ed.2d 13 (1990). However, "attenuation analysis is only appropriate where, as a

1. Although the instructions to Forms 1040EZ and 1040A (at issue in *Reynolds* and *Borman)* state that those forms cannot be used if the taxpayer has certain types of income, the forms themselves contain no such warnings.

threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity." *Id.* (internal quotation omitted). This is not a "but for" test; rather, "[t]he penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *Id.* at 17, 110 S.Ct. at 1642–43 (internal quotation omitted). In this case, the threshold test is not met.

The illegality here was a warrant that provided insufficient guidance to the executing agents about what documents they could seize. *See United States v. Kow,* 58 F.3d 423, 427 (9th Cir.1995). There is no dispute that the agents had probable cause to search and that a magistrate authorized it. Thus, the agents had a legitimate, court-authorized reason for being present at the time of questioning. The only constitutional principle implicated in the agents' questioning of Hong was their right to be on the premises, and neither side argues that they were there unlawfully. Under these circumstances, Hong's statement is not the product of the illegality-the overbroad warrant. Additionally, suppressing the statement does not serve the purpose of ensuring that warrants provide sufficient guidance to agents about what documents to seize. *Compare New York v. Harris,* 495 U.S. at 18–19, 110 S.Ct. at 1643–44 (statements of defendant arrested without warrant in violation of Fourth Amendment not suppressed because there was probable cause for his arrest) *with Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (statements of defendant arrested without warrant and without probable cause suppressed).

## V

 Ladum argues that the district court erred in denying his motion for acquittal on Count 19, which charges that Ladum "corruptly endeavored to influence, obstruct and impede the due administration of justice in the appearance of Patrick Mathis before a federal grand jury" in violation of 18 U.S.C. § 1503(2). Ladum first argues that 18 U.S.C. § 1503 does not prohibit witness tampering. He contends that such conduct falls solely under 18 U.S.C. § 1512. Ladum next argues that even if § 1503 does cover witness tampering, there is insufficient evidence to convict him of violating that statute. We review the district court's denial of a motion for acquittal in the same manner as a challenge to the sufficiency of the evidence. *United States v. Allen,* 88 F.3d 765, 768 (9th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 1565, 137 L.Ed.2d 711 (1997). Thus, we review the evidence presented in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## A

 In 1982, Congress enacted the Victim and Witness Protection Act (VWPA). This statute removed all references to witnesses in § 1503 and enacted a new § 1512, addressed specifically to the influencing of witnesses, victims, and informants. The Second Circuit in *United States v. Hernandez,* 730 F.2d 895, 898 (2d Cir.1984), concluded that § 1512 replaced that part of § 1503 that pertained to witnesses. The *Hernandez* case involved a threat to kill a witness, and the court held that the charge could not be sustained under § 1503. *Id.*

Our court faced a charge of witness tampering under somewhat different circumstances in *United States v. Lester,* 749 F.2d 1288 (9th Cir.1984). *Lester* involved the hiding and bribing of a witness in order to prevent him from testifying in a criminal trial. We disagreed with the Second Circuit's broad statement in *Hernandez* that "[C]ongress affirmatively intended to remove witnesses entirely from the scope of § 1503." *Lester,* 749 F.2d at 1295 (internal quotation omitted). We distinguished *Hernandez,* noting that it dealt with intimidation and harassment of a witness, whereas *Lester* involved non-coercive witness tampering. We observed that § 1512 did not encompass such non-coercive conduct and, thus, concluded that this conduct still remained punishable under the omnibus clause of § 1503. *Id.* at 1295–96.

Section 1512 was amended in 1988 to cover non-coercive witness tampering. Ladum

claims that this amendment implicitly removed such tampering from the reach of § 1503, and removed the underpinnings of *Lester.* Ladum finds some support in *United States v. Aguilar,* 21 F.3d 1475 (9th Cir. 1994) (en banc), *aff'd in part, rev'd in part,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). In that case, we considered whether the omnibus clause to § 1503 covered making false statements to a potential grand jury witness. The conduct at issue pre-dated the 1988 amendments, so *Lester* clearly applied. Nonetheless, in interpreting the scope of § 1503, we noted that the 1988 amendments "eliminated the problem that we discussed in *Lester.*" *Id.* at 1485. However, this observation was not necessary to our holding that making false statements to a potential grand jury witness could not amount to "corruptly influencing" a witness. In addition, our holding was rejected by the Supreme Court in *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (holding that a defendant violates § 1503 if his actions "have the natural and probable effect of interfering with the due administration of justice," but declining to address whether the 1988 amendments narrowed the scope of the omnibus clause of § 1503) (citations and internal quotations omitted).

The question we face today is whether the 1988 legislation operated to repeal the omnibus clause insofar as it prohibits witness tampering. There is no doubt that before the 1988 amendments, § 1503 covered efforts to urge a witness to give false testimony or to withhold or destroy evidence. *See United States v. Lench,* 806 F.2d 1443, 1445 (9th Cir.1986). It is also clear that the 1988 legislation did not alter the text of the omnibus clause. "[L]egislative repeals by implication will not be recognized, insofar as two statutes are capable of coexistence, absent a clearly expressed congressional intention to the contrary." *Astoria Fed. Sav. and Loan Ass'n v. Solimino,* 501 U.S. 104, 109, 111 S.Ct. 2166, 2170, 115 L.Ed.2d 96 (1991). Sections 1503 and 1512 are certainly capable of coexistence. For this reason, finding repeal is appropriate only if Congress clearly intended that there be one. The section-by-section analysis of the 1988 legislation notes that the amendments to § 1512

are intended, therefore, merely to include in section 1512 the same protection of witnesses from non-coercive influence that was (and is) found in section 1503. It would permit prosecution of such conduct in the Second Circuit, where it is not now permitted, and would allow such prosecutions in other circuits to be brought under section 1512 rather than under the catch-all provision of section 1503.

134 Cong. Rec. S17,369 (1988) (statement of Senator Biden). This passage indicates that the drafters of the 1988 legislation believed that the omnibus clause of § 1503 would still prohibit witness tampering. *Cf. United States v. Tackett,* 113 F.3d 603, 611 (6th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 879, 139 L.Ed.2d 868 (1998). As this passage does not constitute clear evidence of an intent to effect any change to the scope of § 1503, and Ladum has failed to point to any other evidence regarding Congress's intent, we hold that the omnibus clause of § 1503 continues to prohibit witness tampering. In this view, we join three other circuits that have held that the 1988 amendment of § 1512 did not affect the reach of § 1503. *See Tackett,* 113 F.3d at 610–11; *United States v. Maloney,* 71 F.3d 645, 659 (7th Cir.1995), *cert. denied,* — U.S. —, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); *United States v. Kenny,* 973 F.2d 339, 343 (4th Cir. 1992). *But see United States v. Masterpol,* 940 F.2d 760, 763 (2d Cir.1991) (holding that § 1512 replaced that part of § 1503 that pertained to witnesses).

**B**

▮ Ladum asserts that even if § 1503 covers witness tampering, there is insufficient evidence to convict him of corruptly attempting to persuade Patrick Mathis so as to influence his testimony before the grand jury. Ladum argues that the bulk of the government's evidence dealt only with Ladum's approving of plans hatched by Mathis. He contends that such actions are not covered by § 1503's prohibition against "corruptly ... influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice." We disagree.

Ladum suggested that Mathis lie to the grand jury, and Mathis did, in fact, lie to the grand jury. Ladum also approved of Mathis's plan to alter records to hide Ladum's involvement. Mathis testified that he would not have altered the records and presented them to the grand jury without first obtaining Ladum's consent and approval. Ladum also directed Mathis to have Weaver create a backdated lease, to have Grigonis sign it, and to present it to the grand jury. This evidence is sufficient to establish an endeavor to influence, obstruct, or impede the due administration of justice in violation of § 1503. *See Aguilar,* 515 U.S. at 599–600, 115 S.Ct. at 2362.

Ladum's argument that the false records cannot support a conviction because they were never presented to the grand jury lacks merit. Mathis was subpoenaed to bring documents to the grand jury. After failing to do so, he was instructed during his grand jury testimony to produce the records at the U.S. Attorney's office within 72 hours. "[C]onduct [is] punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way. Were a defendant with the requisite intent to lie to a subpoenaed witness who is ultimately not called to testify, or who testifies but does not transmit the defendant's version of the story, the defendant has endeavored to, but has not actually, obstructed justice.... [A] jury could find such defendant guilty." *Aguilar,* 515 U.S. at 601–02, 115 S.Ct. at 2363.

## VI

Ladum and Grigonis argue that the district court erred when it denied their motions for acquittal on Counts 21–30, laundering the proceeds of their bankruptcy fraud in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Counts 21–30 charge that the stores, the funds they produced, and the real property housing them were proceeds of the bankruptcy fraud.

The counts further charge that Ladum and Grigonis concealed the ownership and control of the bankruptcy fraud proceeds by directing the store nominees to write "rent" checks from the store funds to Grigonis, who in turn would make mortgage payments with the funds, perpetrating the illusion that Grigonis was the true owner of the real properties.

### A

 Charged with engaging in a "financial transaction," Ladum and Grigonis claim that there was insufficient evidence that the rent checks involved the use of a financial institution engaged in interstate commerce. A "financial transaction" is "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4)(B).[2]

 Proof that a transaction employs a utility of interstate commerce is sufficient to satisfy § 1956(c)(4)(B). *United States v. Ripinsky,* 109 F.3d 1436, 1444 (9th Cir.1997), *amended on denial of reh'g,* 129 F.3d 518 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 870, 139 L.Ed.2d 767 (1998). Evidence of a transaction involving financial institutions insured by the Federal Deposit Insurance Corporation (FDIC) is also sufficient to meet § 1956's interstate commerce requirement. *Id.* (citing *United States v. Peay,* 972 F.2d 71, 74–75 (4th Cir.1992)).[3] Inscriptions on bank documents may be considered in establishing the bank's status. *United States v. Allen,* 88 F.3d 765, 769 (9th Cir.1996) (bank's FDIC status proved by words "Member FDIC" on bank statements).

The government introduced evidence that five checks written on Grigonis's account were cleared through banks in California, Washington, and Canada, and that Grigonis deposited a check received from a New Jersey business into his account. Addition-

---

**2.** A nexus with interstate commerce is both a jurisdictional requirement and an essential element of the offense. *United States v. Ripinsky,* 109 F.3d 1436, 1443 (9th Cir.1997), *amended on denial of reh'g,* 129 F.3d 518 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 870, 139 L.Ed.2d 767 (1998).

**3.** Contrary to Grigonis's assertions, proof of FDIC status is not necessary to meet the interstate commerce requirement. *See Ripinsky,* 109 F.3d at 1444–45.

ally, the government introduced many of Grigonis's bank statements. One statement describes U.S. Bank as "a subsidiary of U.S. Bancorp., the largest financial services holding company headquartered in the Pacific Northwest." Other statements indicate that account holders can obtain cash from automatic teller machines in other states, purchase travelers checks, access account information and transfer funds over the telephone, finance the purchase of a car, boat, or recreational vehicle, or obtain a credit card. This is sufficient evidence from which any rational trier of fact could have found beyond a reasonable doubt that U.S. National Bank of Oregon was engaged in "interstate or foreign commerce in any way or degree."

**B**

■ Ladum and Grigonis also argue that there was insufficient evidence to support their convictions on Counts 21 through 30 because the rent payments were not proceeds within the meaning of the money laundering statute. We disagree.

Ladum and Grigonis contend that only the stores that were concealed from the bankruptcy court constitute proceeds. They argue that the income earned by those stores, which was used to make the rent payments, is derivative of the proceeds and, therefore, beyond the statute. The Bankruptcy Code, however, defines the property of the bankruptcy estate to include "proceeds, product, offspring, rents, or profits of or from the property of the estate." 11 U.S.C. § 541(a)(6). In addition, we have determined that income earned by a business after the filing of a bankruptcy petition is part of the property of the estate. *In re FitzSimmons,* 725 F.2d 1208, 1210–11 (9th Cir.1984). Therefore, the proceeds of Ladum's bankruptcy fraud include not just the stores, but also the funds received by those businesses. *See United States v. Levine,* 970 F.2d 681 (10th Cir.1992).

**C**

■ Grigonis argues that because he was acquitted of Counts 5–8, filing a false tax return, and Counts 13–14, making false state-

ments, the jury concluded that Grigonis was the lawful owner of the property which contained the stores. Thus, he argues, there is no connection between the rents paid for these properties and the bankruptcy fraud. However, the jury's conviction of both Ladum and Grigonis on Count 20, concealing assets of a bankruptcy estate, refutes Grigonis's argument that the jury concluded Grigonis was the true owner of the properties. *See United States v. Powell,* 469 U.S. 57, 64, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984) ("[W]here truly inconsistent verdicts have been reached, '[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'") (quoting *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932)).

■ Similarly lacking force is Grigonis's argument that he had no way of knowing that the money was coming from an unlawful activity because the rent was from a derivative transaction. Grigonis was convicted of concealing assets from a bankruptcy estate by knowingly making materially false declarations under oath, in violation of 18 U.S.C. § 152. As the Bankruptcy Code defines rents as the property of the bankruptcy estate, 11 U.S.C. § 541(a)(6), the rent checks Grigonis received emanated from the bankruptcy fraud. *Cf. Levine,* 970 F.2d at 681.

■ Grigonis's contention that he made no attempt to conceal the funds he received as rent also fails. Ladum and Grigonis were charged with concealing the ownership and control of the bankruptcy fraud proceeds by directing the store nominees to write "rent" checks from the store funds to Grigonis, who in turn would make mortgage payments with the funds. This perpetrated the illusion that Grigonis, rather than Ladum, was the true owner of the real properties and the profits they produced. Thus, it does not matter that Grigonis handled the rent checks as though they were legitimate funds. The transactions with the rent checks were designed "to conceal or disguise ... the ownership, or the control of the proceeds of the specified un-

lawful activity," 18 U.S.C. § 1956(a)(1)(B), because they prevented the bankruptcy trustee from knowing that Ladum was the legitimate owner of the stores and that the estate was entitled to the profits from those stores. *See also United States v. Golb,* 69 F.3d 1417, 1422 (9th Cir.1995) (sufficient evidence of concealment when assets are placed in the names of nominees), *cert. denied,* 517 U.S. 1127, 116 S.Ct. 1369, 134 L.Ed.2d 534 (1996).

 Ladum and Grigonis further argue that the district court should have dismissed counts 21 through 30 of the indictment because the rent checks were deposited after Ladum was discharged from bankruptcy on May 11, 1990 and that they could not have promoted the crime of bankruptcy fraud after its commission. However, the indictment charged that the rent checks *concealed* the bankruptcy fraud in violation of 18 U.S.C. § 1956(a)(1)(B)(i), not that the checks *promoted* the fraud in violation of § 1956(a)(1)(A)(i). As the indictment followed the statutory language of § 1956(a)(1)(B)(i), and that section sets forth fully, directly, and clearly all essential elements of the crime, the indictment was sufficient and there was no basis for its dismissal. *United States v. Woodruff,* 50 F.3d 673, 676 (9th Cir.1995).

### VII

Weaver and Ford argue that there was insufficient evidence to convict them of conspiring to defraud the United States in violation of 18 U.S.C. § 371. They both contend that there was no evidence demonstrating that they intended to impede the IRS in its ascertainment, computation, assessment, and collection of Ladum's income taxes as charged in the indictment or that they knew the purpose of the conspiracy was to hide Ladum's income from the IRS.

 "To prove a conspiracy, the government must show (1) an agreement (2) to engage in criminal activity and (3) one or more overt acts in furtherance of the conspiracy." *United States v. Hernandez,* 876 F.2d 774, 777 (9th Cir.1989). Knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction. *United States v. Krasovich,* 819 F.2d 253, 255 (9th Cir.1987). Thus, where the objective of the conspiracy is alleged to be interference with "the ascertainment, computation, assessment, and collection of ... [Ladum's] income taxes," the government must prove knowledge of that objective. *Id.* However, we do not require this to be proven by direct evidence. "Circumstantial evidence and the inferences drawn from that evidence will sustain a conspiracy conviction." *United States v. Castro,* 972 F.2d 1107, 1110 (9th Cir.1992); *see also United States v. Calabrese,* 825 F.2d 1342, 1348 (9th Cir.1987) ("[A] defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence."). Viewing the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the government, the evidence was sufficient to permit a reasonable jury to find that Weaver and Ford knew the object of the conspiracy was to thwart the IRS's tax collection efforts.

 Weaver succeeded Northouse as the nominee at Abe's Shop in 1989. Although Weaver claimed that he was the owner of the store, he made only a few appearances at Abe's between July 1989 and October 1992. Additionally, Northouse testified that he neither sold nor transferred Abe's to Weaver because the store was Ladum's and he had no real interest in it. Weaver showed concert of action with his fellow nominees in concealing Ladum's interest from the IRS. He did not report any of the business operations of Abe's on his tax returns, and, like Hong and Van Vliet, Weaver lied when approached by authorities. In June 1990, Weaver told an IRS agent that he had acquired Abe's from Northouse by evicting him and that he was the sole owner of the store. Again in 1993, he insisted to an IRS agent that he, not Ladum, was the owner of the store. Additionally, Weaver created a false lease for Mathis to give to the grand jury and encouraged Mathis to lie to the grand jury. "The coordinated actions of the codefendants are strong circumstantial evidence of an agreement. The likelihood that these actions were not driven by an agreement is extremely remote.... The jury could rea-

sonably infer from the defendants' concerted action that all the parties [were] working together understandingly, with a single design for the accomplishment of a common purpose." *United States v. Fulbright,* 105 F.3d 443, 448 (9th Cir.) (citations and quotations omitted) (upholding conspiracy conviction where there was no direct evidence of conspiracy, but defendant and his coconspirators had sent identical intimidating correspondence to judges), *cert. denied,* —— U.S. ——, 117 S.Ct. 1836, 137 L.Ed.2d 1041 (1997).

Ford was the nominee at Dave's Shop from 1983 to 1986 and at The Money Man from 1989 to 1992. Testimony of his coconspirators established that he was not the true owner of these stores. After Ford was replaced as nominee of The Money Man in 1992, he created a phony sales document representing the transfer. Further, several meetings were held in which nominees were instructed to make no reference to Ladum on their tax returns and to report only minimal income. While none of the trial testimony placed Ford at those meetings, he acted in concert with the other nominees. Similar to Hong and Van Vliet, he filed Schedule C's with his 1989 and 1990 tax returns, representing that he was the sole proprietor of The Money Man. "The jury could reasonably infer from the defendants' concerted actions" that Ford was working with the others to thwart the IRS's tax assessment. *See Fulbright,* 105 F.3d at 448. Therefore, sufficient evidence supports Weaver and Ford's convictions on the conspiracy count.

## VIII

■ Weaver and Ladum argue that the district court erred in imposing a two-level increase in their base offense levels pursuant to U.S.S.G. § 2T1.1(b)(1) based on their failure to report income exceeding $10,000 from criminal activity. Section 2T1.1(b)(1) mandates a two-level increase "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." " 'Criminal activity' means any conduct constituting a criminal offense under federal, state, local, or foreign law." § 2T1.1(b)(1), app. note 3. We

review de novo the district court's application and interpretation of the Guidelines, but the district court's factual determinations are reviewed for clear error. *United States v. Ford,* 989 F.2d 347, 349 (9th Cir.1993).

■ In 1989, Weaver applied for and received a federal firearms license for Abe's Shop, but failed to disclose Robert Ladum as a partner or responsible person in the business, and falsely stated that he had acquired Abe's from Northouse. This was a violation of 18 U.S.C. § 924(a)(1)(A). Neither Weaver nor Ladum reported any income from Abe's on their tax returns. Based on the calculations in the presentence report (PSR) that Abe's had more than $21,000 in profits on gun sales between January 1, 1990 and April 26, 1990, the district court concluded that there was "sufficient evidence to make a finding that Mr. Ladum and Mr. Weaver *each* profited more than $10,000 in a given year" from criminal activity. Therefore, it applied the two-level enhancement pursuant to § 2T1.1.

Weaver and Ladum argue that this enhancement should not have been applied because they did not engage in criminal activity that produced income. They argue that since Weaver had a dealer's license, his firearm sales did not violate § 922(a)(1). They contend that the only crime Weaver committed was making a false statement in a license application in violation of § 924(a)(1)(A). Relying on *United States v. Ford,* 989 F.2d 347, 350 (9th Cir.1993), they argue that this offense generated no income.

In *Ford,* the defendant had fraudulently extracted hundreds of dollars in escrowed funds held by Canadian banks by submitting false invoices, contracts, and bills of lading. *Id.* at 348. He had also been convicted of tax fraud in Canada. *Id.* at 350. The district court applied a § 2T1.3(b)(1) enhancement on the grounds that more than $10,000 of Ford's unreported income was, "in part, the 'fruits' of his fraudulent activities in Canada." *Id.* at 349. We noted that these fraudulent activities did result in over $10,000 of unreported income, but held that the § 2T1.3(b)(1) enhancement was inappropriate, because the guidelines as then written defined criminal activity as conduct constituting a criminal

offense under federal, state, or local law, and Ford's Canadian conduct did not constitute a criminal offense under federal, state, or local law. *Id.* at 350. In rejecting the enhancement, we also noted that the criminal activity of § 2T1.3(b)(1) "cannot refer to tax fraud or tax evasion, since these activities do not actually generate any income; they merely result in an amount of previously generated income being unlawfully withheld from the taxing authority." *Id.*

■ Unlike tax fraud, however, by making false statements on his firearms application, Weaver was able to obtain a facially valid firearms license which enabled him to sell guns resulting in more than $10,000 in income. The income produced from the gun sales was the fruit of the illegal activity.[4]

Ladum argues that the enhancement should not have been applied because there was no showing that he, rather than Weaver, had the income and failed to report it. Weaver argues similarly, claiming that the government did not demonstrate that he received the $10,000 in income. This argument fails because the district court found that there was sufficient evidence to make a finding that Ladum and Weaver *each* profited more than $10,000 in a given year, and this finding is not clearly erroneous. When the $21,000 profit figure for the four-month period is extrapolated to cover an entire year, profit from the sale of guns is more than $60,000. Testimony at trial established that Ladum and the nominees split net profits from the second hand stores with Ladum receiving between 50 percent and 80 percent and the nominees receiving between 20 percent and 50 percent. Thus, the court properly applied § 2T1.1(b)(1)'s two-level enhancement to both Weaver and Ladum.

Ladum also contends that once the costs of goods and doing business are accounted for, there was no showing that more than $10,000 income was realized. This argument fails as the $21,000 profit figure for the four-month period in 1990 was derived by subtracting sales price from cost of goods sold and nothing in the Guidelines requires the government to determine and deduct the portion of overhead expenses fairly allocable to gun sales. *See* § 2T1.1, app. note 1 ("In some instances, such as when indirect methods of proof are used, the amount of tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts.").

Finally, Weaver argues that the enhancement should apply only to Ladum because Ladum owned Abe's, and thus, Weaver was not charged with failing to report or to correctly identify the source of income. We disagree because § 2T1.1(b)(1) does not require that the defendant be charged with failing to report income for the two-level enhancement to apply; it merely states that "[if] the defendant failed to report or to identify correctly the source of income ... increase by 2 levels." Since the evidence shows that Ladum did own Abe's and that Ladum paid Weaver based on a percentage of the profits, Weaver failed to report or correctly identify the source of this income. Thus, the enhancement was properly applied to Weaver.

## IX

■ Ladum argues that he is entitled to resentencing because the district court did not realize that it had discretion to depart downward to criminal history category I if it deemed such departure appropriate. We disagree.

Ladum's PSR included 3 points for his 1970 conviction for failure to submit to induction in his criminal history score. This gave Ladum a criminal history category of II. During sentencing, the court stated: "Well, after review of the materials, the court-notwithstanding that its 25 years ago, I think the court is required to take that into account, which would make this a category 2." When Ladum's counsel asked: "Your honor, am I correct in terms of you saying that you feel you have no choice in the matter?" the court replied, "It's my understanding." From this, Ladum argues that it is clear, the

---

4. Contrary to Weaver's assertions, a prior conviction is not a prerequisite to a criminal activity enhancement under § 2T1.1(b)(1). *See United* *States v. Karterman,* 60 F.3d 576, 580 (9th Cir. 1995).

district court based its refusal to depart on its conclusion that the law prevented it from doing so.

We read the transcript differently and conclude that rather than expressing its view that it had no authority to depart from Criminal History Category II if it felt that the criminal history category overrepresented the seriousness of Ladum's history, the court was making clear that the Guidelines required it to take the conviction into account in initially computing Ladum's criminal history category, despite the fact that Ladum had been pardoned. *See* § 4A1.2, app. note 10.

█ Although the court did not explicitly acknowledge its ability to depart, the court's silence regarding authority to depart is not sufficient to indicate that the court believed it lacked power to depart. *United States v. Garcia–Garcia,* 927 F.2d 489, 491 (9th Cir. 1991) (per curiam). While an appeal premised on the district court's belief that it lacked authority to depart is permissible, an appeal based on the merits of a district court's refusal to depart is not. *Id.* "Failure to depart without comment on the authority to do so does not convert a discretionary departure into a sentence imposed in violation of law." *Id.* Because we do not believe the district court commented on its ability to depart, we do not have jurisdiction to review the district court's discretionary decision not to depart downward from the sentencing guidelines. *United States v. Morales,* 898 F.2d 99 (9th Cir.1990).

### X

█ Ladum argues that the district court erred when it imposed a $15,000 fine payable within 90 days without regard to his ability to pay. The district court's determination that a defendant has the ability to pay a fine is reviewed for clear error. *United States v. Favorito,* 5 F.3d 1338, 1339 (9th Cir.1993).

█ Section 5E1.2(a) provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The guideline range for an offense level of 31 is a fine of $15,000 to $500,000. § 5E1.2(c)(3). The de-

fendant bears the burden of proving that he is unable to pay a fine. *Favorito,* 5 F.3d at 1339. This burden is not met if the evidence presented by the defendant merely creates a "conflict in information before the court." *Id.* Where the record fails to show a defendant's inability to pay a fine, or that he is "not likely" to be able to pay a fine, and there is evidence supporting the contrary conclusion, the court may impose a fine within the guideline range. *United States v. Ortland,* 109 F.3d 539, 548 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 141, 139 L.Ed.2d 89 (1997).

The district court adopted the findings of the PSR regarding Ladum's ability to pay. The PSR concluded that Ladum had the ability to pay a fine within the guideline range because, "based on the evidence established at his trial, it appears Ladum made significant income between 1983 and 1996, only some of which has been accounted for." Although Ladum objects to the PSR's conclusion about his ability to pay and notes that in response to his objections in his sentencing letter, the government did not come forward with any evidence of Ladum's ability to pay, the government did not have the burden to show ability to pay. Rather, Ladum was required to show his inability to pay. *Favorito,* 5 F.3d at 1339. Although Ladum claims indigency, noting that any interest he may have had in the real estate in which the second hand stores were located, the mansion at 3814 N.W. Thurman, and Wallowa Lake Lodge has been forfeited to the government, and that he has been represented by court-appointed counsel since 1992, *see* § 5E1.2, app. note 3 (representation by assigned counsel is a significant indicator of present inability to pay a fine), we conclude that he has failed to carry his burden. The evidence showed that Ladum earned substantial sums through the second-hand stores well into the 1990's. Abe's Shop alone could bring in up to $3,000 in profit daily through 1992. In the early 1990's Ladum was paying the college tuition and living expenses for his nephew. In addition, in 1993, Ladum had $12,000 in cash and merchandise available to give Mathis to start his tenure at the Money Man. Based on this evidence, the court did

not clearly err in imposing a $15,000 fine on Ladum.

## XI

■ Weaver also argues that the district court erred in imposing a $10,000 fine without determining his ability to pay. The district court found, by adopting the findings in the PSR, that Weaver had the ability to pay a $10,000 fine because his net worth was $38,650 and he had significant assets that had not been disclosed.

Weaver did not object to the imposition of a fine until after the court imposed the fine at sentencing. At that point, Weaver's counsel stated that "in light of the surrender date, I can tell the court it's probably impossible that he can pay this fine in 90 days. What does the court suggest happen?" This was far from sufficient to satisfy his burden of demonstrating his inability to pay. *See Ortland,* 109 F.3d at 549. In light of Weaver's failure to demonstrate his inability to pay, and the strong evidence that Weaver could pay, the court did not clearly err in imposing the fine.

## XII

Ford argues that the district court erred in determining that he was responsible for the entire loss attributed to the conspiracy pursuant to § 1B1.3. He asserts that there was no evidence as to the pricing system at his store, and thus that the calculation of loss at his store was purely speculative. He further maintains that because he withdrew from the conspiracy for great lengths of time and because there was no evidence that he knew how the other stores were operated, he should not be held responsible for loss between November of 1986 and December 1988, and from January 1989 until July 1989, or for any activity after March of 1993; and that a specific determination needs to be made regarding what tax loss was reasonably foreseeable to him while he was a participant in the conspiracy. Although we reject Ford's argument that the loss calculation at his

store was too speculative, we are concerned that Ford may well have been tagged with a higher amount of tax loss than could reasonably have been foreseen by him under the circumstances. Thus, we remand for a specific determination of the amount of tax loss that was reasonably foreseeable to him based on the criminal conduct he agreed to undertake.

### A

■ The loss figure for the years in which Ford did actively participate in the second-hand stores was not too speculative. The total loss figures were calculated pursuant to § 2T1.1. The commentary to that section contemplates that the court will simply make a reasonable estimate based on the available facts. § 2T1.1, app. note 1. Because trial testimony established that cost of goods sold was a much lower percentage of gross receipts than was reported by defendants on their income tax returns, the PSR concluded that gross receipts were substantially understated on tax returns.[5] In order to calculate the understated gross receipts from Division Cash from 1988 through 1994, Columbia Cash from 1987 through 1993, and The Money Man from 1989 to 1992, the PSR estimated the cost of goods sold as being equal to 50 percent of gross profits. The PSR relied on trial testimony to calculate the unreported net income from Dave's Shop, The Money Pit, Abe's, and The Money Man. Additionally, the PSR relied on suppressed records to calculate some of the income from Abe's Shop. The total tax loss was estimated by the PSR as $931,595. The district court later reduced the tax loss figure to one that exceeded $550,000.

Although there was no direct evidence that Ford was understating gross receipts from The Money Man during his tenure as nominee, there was substantial circumstantial evidence that he was doing so. Northouse, Jr., the nominee at The Money Man before Ford, and Mathis, the nominee after Ford, testified about very similar operational methods, despite the fact that they did not know one

---

**5.** Testimony at trial established that the cost of goods sold was anywhere between 10 and 40 percent of gross receipts. On the tax returns of

Ford, Hong, and Van Vliet for the years 1986 through 1994, cost of goods sold was reported as being as high as 77 percent.

another. They both stated that they skimmed receipts, split profits with Ladum, and filed tax returns claiming to be the sole owner. Ford similarly filed tax returns claiming to be the sole owner and claimed improbably high costs of goods sold. This evidence was sufficient to show his involvement in and underreporting of income. Thus, calculation of loss as to The Money Man during Ford's tenure was not speculative and the tax loss from the other stores during the time periods in which he was involved in the conspiracy was reasonably foreseeable to Ford.

### B

■ In determining tax loss, Ford is responsible for "all reasonably foreseeable acts and omissions ... in furtherance of the jointly undertaken criminal activity." § 1B1.3(a)(1)(B). However, according to the commentary to § 1B1.3, the principles and limits of criminal liability are not always the same as the principles and limits of sentencing accountability under that section. § 1B1.3, app. note 1. The focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a conspirator. *Id.* This requires a determination of "the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.,* the scope of the specific conduct and objectives embraced by the defendant's agreement)." *See* § 1B1.3, app. note 2.

Ford was the nominee at Dave's Shop from 1983 to 1986. During this time he also acted as a floater between stores, filling in for other employees. The government has not pointed to evidence indicating that after 1986 Ford was involved in the second hand stores until he became the nominee at The Money Man in July 1989, and Ford's PSR indicates that Ford was not associated with the second-hand stores from 1986 to 1989.[6] Ford was the nominee at The Money Man between July 1989 and late 1992. He then helped

Mathis at The Money Man until March 1993. From that point on, Ford ran a car-hocking business out of the back room of The Money Man.

Ford did not effectively withdraw from the conspiracy between 1986 and 1989, for he did not show that he "acted affirmatively to defeat or disavow the purpose of the conspiracy." *United States v. Melvin,* 91 F.3d 1218, 1226 (9th Cir.1996). However, this does not mean that the total loss exceeding $550,000 was reasonably foreseeable to him. *Melvin,* upon which the government relies, is not to the contrary. Melvin participated in an enterprise that conducted fraudulent get-rich-quick schemes. *Id.* at 1221. During a five-year period, the conspiracy, organized by Fieler Enterprises, oversaw eighty schemes which took money from the financially unsophisticated in exchange for useless information. *Id.* Melvin was responsible for devising at least three schemes. *Id.* He also assisted in carrying out several others. *Id.* At sentencing, Melvin was held responsible for the amount of loss from each of the five schemes that he participated in. On appeal, Melvin claimed that he should not be held responsible for losses that occurred after he was fired from the organization in 1989. *Id.* at 1226. Rejecting this contention, the court noted:

> Evidence given at trial proved that Melvin was involved in the creation of ads for each of the schemes used in the calculation. Profits from all of these schemes were thus reasonably foreseeable. There was substantial evidence that the schemes and ads, and therefore the resulting losses from the charged schemes, began with Melvin.

*Id.* at 1226. As Melvin had made no effort to "undo the damage from the schemes he had helped set in motion," *id.* at 1227, the court concluded that losses from these schemes were properly included in the calculation although he was not held responsible for the other seventy-five schemes.

In this case, the district court, by adopting the findings of Ford's PSR, concluded that as Ford was involved in this thirteen-year con-

---

6. Ford did, however, write personal checks to Ladum's uncle in connection with the Wallowa

Lake Lodge on two occasions in December 1988.

spiracy for all but three years, he is responsible for the entire tax loss pursuant to § 1B1.3. The court did not make a specific finding on whether the loss that occurred between 1986 and 1989 was reasonably foreseeable to Ford based on the scope of the joint activity that Ford agreed to undertake between 1983 and 1986. *See United States v. Petty,* 992 F.2d 887, 890 (9th Cir.1993) (relevant conduct is not necessarily the same for every participant, and each defendant must be sentenced on the basis of the quantity of drugs which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators). When Ford left Dave's Shop in 1986, The Money Pit, Union Cash, and Division Cash had not even begun operating yet. It is not self-evident to us that it was foreseeable to Ford that tax loss from the stores that were in operation in 1986 would continue to 1989, or that there would be tax loss from stores that had not been established in November 1986. Therefore, we remand to the district court for findings on the extent of the loss that was reasonably foreseeable to Ford and for re-sentencing.

## XIII

 Ford argues that the district court erred in computing his criminal history by including two municipal ordinance violation convictions arising out of the operation of Dave's Shop. He claims that those activities were part of the instant offense.

In calculating Ford's criminal history, one point was added for a June 1985 conviction for purchasing regulated property and failing to fill in all the spaces and to require the seller to sign his name on a form supplied by the police department. One point was also added for an October 1985 conviction for unlawfully selling regulated property. An additional two points were added pursuant to § 4A1.1(d)(2) because the instant offense occurred while Ford was on probation for these ordinance violations.

Ford claims that assessing criminal history points for these violations was improper because the local ordinance convictions were not "prior sentences" within the meaning of § 4A1.2(a)(1).[7] Ford maintains that the local ordinance convictions and the tax conspiracy charges of which he was found guilty are relevant conduct within the definition of § 1B1.3, as part of the "same course of conduct" or part of a "common scheme or plan." He notes that one of the ways the nominees would hide Ladum's interest and skim profits was by keeping inadequate, false, or nonexistent records of sales. He argues that the local ordinance violations are for exactly that conduct-not complying with Portland's record keeping requirement. Because the conduct that led to the local convictions constituted conduct that was part of the instant tax conspiracy offense, he argues, those convictions should not have been used to enhance his criminal history score.

We rejected a similar argument in *United States v. Buchanan,* 59 F.3d 914 (9th Cir. 1995). In that case, Buchanan was convicted of mail fraud resulting from a scheme in which he sold automobiles and kept the proceeds while another claimed that the cars had been stolen and sought insurance reimbursement. He was assessed one criminal history point for a state conviction for unlawful alteration of a vehicle identification number ("VIN"). He argued that the conduct underlying the state "VIN" conviction was part of the federal mail fraud offense and thus the state offense should not have counted as criminal history. We disagreed since there was an insufficient degree of similarity and connection between the state and federal offenses, despite the fact that both involved fraud and a common participant. *Id.* at 918. We noted that the two offenses were entirely different crimes and that the state conviction resulted from a discrete, identifiable illegal act that was not an integral part of the federal offense conduct. *Id.*

Similarly, we conclude that the district court properly assessed criminal history points for Ford's prior local ordinance viola-

---

**7.** Guideline § 4A1.2(a)(1) defines "prior sentence" as any sentence previously imposed for conduct not part of the instant offense. "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." § 4A1.2 app. note 1.

tion convictions because there was an insufficient degree of similarity and connection between the current offense and the local offenses. The object of the tax conspiracy was impeding the IRS's determination of Ladum's taxes. The ordinance violations involved Ford's failure to fill in certain information on police property forms and his sale of regulated second-hand property prior to the expiration of a waiting period. These violations were not pled in the indictment, nor were they used to prove the instant offense. Finally, although the ordinance violations took place during the course of the conspiracy and the offenses are somewhat similar in character because they involve record keeping, the offenses involve different victims-local authorities instead of the IRS-and different societal interests-the regulation of stolen property instead of tax collection. *See Buchanan,* 59 F.3d at 918.

### XIV

 Grigonis claims that the district court erred in not granting him a minor role adjustment under § 3B1.2. A district court's finding that a defendant does not qualify for minor or minimal participant status is heavily dependent on the facts of the particular case, and we uphold such a finding unless it is clearly erroneous. *United States v. Davis,* 36 F.3d 1424, 1436 (9th Cir.1994). The defendant has the burden of proving by a preponderance of the evidence that he is entitled to a downward adjustment based on his role in the offense. *Id.* Less culpability than other codefendants does not necessarily entitle a defendant to a role adjustment. *United States v. Benitez,* 34 F.3d 1489, 1498 (9th Cir.1994). He must show that he was substantially less culpable than the average co-participant. *Id.* at 1497. Section 3B1.2 role adjustments are to be used infrequently. *United States v. Hoac,* 990 F.2d 1099, 1105–06 (9th Cir.1993).

 Grigonis argues that his only involvement in the conspiracy was as the property owner of the buildings in which the second-hand stores were housed. Additionally, he argues that the jury's acquittal of him on charges that he filed a false tax return and made false statements shows that the jury believed that he was the legitimate owner of the properties. He contends that this shows that he was far less culpable than any other defendant.

By convicting Grigonis of bankruptcy fraud, the jury must have found that the properties in his name were not his own. The jury's acquittal of Grigonis on the other charges at most shows that the jury acted inconsistently. *Powell,* 469 U.S. at 64, 105 S.Ct. at 476. Thus, the fact that Grigonis was acquitted of some of the charges does not mean he was not guilty of the bankruptcy fraud charges or that he is somehow less culpable than the other co-participants.

The record shows that Grigonis was not a minor or minimal participant. Between 1985 and 1987, Grigonis used Ladum's money to purchase five second-hand stores. Grigonis held title to the properties and collected rent from store nominees from 1985 through the 1996 verdicts. When necessary, Grigonis helped Ladum gain access to the stores by signing contracts with the alarm company and pretending to evict one of the nominees. Grigonis also played an instrumental role in the bankruptcy proceedings. He lied under oath to the bankruptcy trustee about Ladum's interest in the properties and about funneling money through his accounts to Ladum's lodge. After the discharge, Grigonis perpetrated fraud on the bankruptcy court, the trustee, and the creditors by continuing to hold title to Ladum's properties solely in his name and by paying the underlying mortgages with store proceeds. The district court did not clearly err in refusing to grant Grigonis a minor role reduction.

### XV

Grigonis argues that the district court erred in allowing the properties where three of the second-hand stores were located to be forfeited because the properties were not an instrumentality of the money laundering offenses or, alternatively, because the forfeiture was excessive.

 Criminal forfeitures, as a form of monetary punishment, are subject to the Eighth Amendment's limitations under the Excessive Fines Clause. *Alexander v. Unit-*

ed States, 509 U.S. 544, 559, 113 S.Ct. 2766, 2776, 125 L.Ed.2d 441 (1993). Our circuit uses a two-pronged approach for determining whether forfeiture of property constitutes an excessive fine. *United States v. Real Property Located in El Dorado County,* 59 F.3d 974, 982 (9th Cir.1995). First, the government must show that the property was an instrumentality of the crime-that there was a substantial connection between the property and the offense. *Id.* at 982, 985. If the government satisfies the instrumentality prong, the claimant has the burden of showing that the forfeiture is grossly disproportionate given the nature and extent of his criminal culpability. *Id.*

■ Grigonis argues that because the jury found him not guilty of filing a false tax return and making false statements, the jury must have believed that Grigonis saved up to buy the properties and was the legitimate owner. Thus, he argues, the property was not an instrumentality of the crime. However, the fact that the jury convicted Grigonis of bankruptcy fraud and money laundering refutes his argument. As *Powell* makes clear, although the verdicts may be inconsistent, that does not mean the jury was not convinced of Grigonis's guilt. *Powell,* 469 U.S. at 64, 105 S.Ct. at 476.

There can be no question but that the properties bear a close relationship to the money laundering activities. Grigonis helped Ladum illegally and secretly withhold these properties from the bankruptcy estate. Then, Grigonis used these properties, which should have been turned over to the bankruptcy court, in the money laundering offenses for which he was convicted. Thus, the government satisfied its burden of showing a substantial connection between the properties and the offense. *See United States v. Real Property, Titled in the Names of Godfrey Soon Bong Kang and Darrel Lee,* 120 F.3d 947, 950 (9th Cir.1997) (real property that housed illegal gambling business was substantially connected to the offense).

■ Grigonis argues that even if the properties are instrumentalities of the crime, the forfeiture of the properties is unduly harsh because it represents the loss of his entire life's savings. In determining propor-

tionality, courts, bearing in mind any *in personam* punishment of the owner, should consider the following factors in determining the harshness of the forfeiture: (1) the fair market value of the property; (2) the intangible, subjective value of the property, e.g., whether it is the family home; and (3) the hardship to the defendant, including the effect of the forfeiture on the defendant's family or financial condition. *Real Property Located in El Dorado,* 59 F.3d at 985. The culpability of the owner should include consideration of the following factors: (1) whether the owner was negligent or reckless in allowing the illegal use of his property; or (2) whether the owner was directly involved in the illegal activity, and to what extent; and (3) the harm caused by the illegal activity. *Id.* at 986.

In this case, the properties have a fair market value of about $500,000. The properties are commercial, not family homes. Additionally, the forfeiture does not cause undue hardship to Grigonis. These properties were not his and should have been lost to the bankruptcy estate. Although Grigonis argues that the use of the property as rental space for second-hand stores was not negligent or reckless, he was directly involved in hiding these assets from the bankruptcy estate. He continued with this deceit for several years, laundering the profits from the stores for Ladum. By doing so, he helped Ladum cheat bankruptcy creditors out of more than $900,000. Given the evidence that these properties never legitimately belonged to Grigonis, that they should have been turned over to the bankruptcy court, and that Grigonis was directly involved in concealing these assets from the bankruptcy court for years, Grigonis failed to show that the forfeiture was disproportionate to his offenses. *See United States v. Feldman,* 853 F.2d 648, 663 (9th Cir.1988).

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

TASHIMA, Circuit Judge, dissenting, in part:

I concur in most of the majority opinion; however, I respectfully dissent from Part VIII. I believe that the district court erred in

imposing a two-level increase in Weaver and Ladum's base offense levels for failure to report income exceeding $10,000 from criminal activity, pursuant to U.S.S.G. § 2T1.1(b)(1) (formerly § 2T1.3(b)(1)). In my view, the government failed to prove by a preponderance of the evidence that the income was derived from "criminal activity."

The Sentencing Guidelines provide for a two-level increase in the base offense level, if the "defendant failed to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity...." U.S.S.G. § 2T1.1(b)(1). "Criminal activity" is defined as "any conduct constituting a criminal offense under federal, state, local, or foreign law." U.S.S.G. § 2T1.1 application note 3. In this case, the relationship between the "criminal activity" and the income-generation is too attenuated to support the enhancement. Under our Circuit law, an enhancement is permissible only if the "criminal activity" *directly* results in the production of income.

Here, Weaver made several false statements on his federal firearms license application, in violation of 18 U.S.C. § 924(a)(1)(A).[1] The majority holds that the unreported profits from each firearm sale was the "fruit" of criminal activity, because without the license, each sale *would have* violated 18 U.S.C. § 922(a)(1)(A). However, as we held in *United States v. Ford,* 989 F.2d 347 (9th Cir.1993), an enhancement is appropriate only for conduct that actually constitutes a criminal offense. *Id.* at 350 ("The Commentary does not define 'criminal activity' as 'conduct that *would constitute* a criminal offense ...,' but as 'conduct *constituting* a criminal offense ....'") (emphasis in the original). And it is that criminal activity which must directly generate the income for the enhancement to apply. *See id.* A false statement on a federal firearms license application, like tax fraud or tax evasion, *see id.,* does not generate any income. The actual firearms sales, pursuant to the license, did generate income, but that was not income from "criminal activity" because Weaver held a facially valid license.

Dealing in firearms is illegal, unless by a "licensed dealer," 18 U.S.C. § 922(a)(1)(A), and a "licensed dealer" is "any dealer who is licensed under the provisions of this chapter." 18 U.S.C. § 921(a)(11). Where an applicant has made a false statement on his license application, he may face criminal charges under 18 U.S.C. § 924(a)(1); he may also have his license revoked, pursuant to 18 U.S.C. § 923(e), *after* notice and a hearing.[2] Weaver's dealer's license may have been voidable due to the false statement, but it was not void. As the majority concedes, Weaver had "a facially valid firearms license." Therefore, the firearms sales did not constitute "criminal activity." *Cf. United States v. Caldwell,* 49 F.3d 251, 252 (6th Cir.1995) ("we do not equate an improper transaction with an unlicensed transaction").

The majority's attempt to distinguish *Ford,* on the basis that the tax fraud involved there did not generate any income and the false license application here "enabled" Weaver to sell guns generating income, is unconvincing. Since the majority treats the gun sales income as illegal, *i.e.,* "criminal activity," that activity could hardly have been "enabled" by Weaver's license-who needs a license to carry on illegal or criminal activity? Thus, this analysis necessarily treats the license as void, which contradicts the majority's own recognition that the license is facially valid. Moreover, the § 2T1.1(b) enhancement is not imposed for activity which "enables" one to engage in criminal activity, but for engaging in criminal activity, *i.e.,* for "conduct constituting a criminal offense."

Under *Ford,* 989 F.2d 347, neither Weaver nor Ladum should have received the § 2T1.1(b) two-level enhancement for the false statements on Weaver's firearms license application. Because I would vacate

**1.** 18 U.S.C. § 924(a)(1)(A) makes it a crime to "knowingly makes any false statement or representation with respect to the information required by this chapter ... in applying for any license...."

**2.** 18 U.S.C. § 923(e) states: "The Secretary *may,* after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Secretary under this chapter."

Weaver and Ladum's sentences and remand for resentencing without the § 2T1.1(b) enhancement, I respectfully dissent from Part VIII.