UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert W. KUBICK, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

William D. Herron, Defendant–
Appellant.

United States of America,
Plaintiff–Appellant,

v.

Robert W. Kubick, William D. Herron,
Defendants–Appellees.

Nos. 98–30082, 98–30083, 98–30097.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1999.

Filed Dec. 10, 1999.

Michael S. Taggart, Deputy Federal Public Defender, Anchorage, Alaska, for defendant-appellant-cross-appellee Herron.

Alan Ellis, Peter Goldberger, and Pamela A. Wilk, Law Offices of Alan Ellis, Sausalito, California, for defendant-appellant-cross-appellee Kubick.

James Barkeley and Joseph W. Bottini, Assistant United States Attorneys, Anchorage, Alaska, for the plaintiff-appellee-cross-appellant.

BEFORE: RYMER, HAWKINS, and McKEOWN, Circuit Judges.

## OPINION

RYMER, Circuit Judge.

Robert W. Kubick and William D. Herron appeal the sentences imposed following their convictions on guilty pleas to one count of conspiracy to commit bankruptcy fraud and one count of conspiracy to impede and impair the Internal Revenue Service (IRS), each in violation of 18 U.S.C. § 371. Among other United States Sentencing Guidelines issues that are raised, both contend that the adjustment for "violation of any judicial . . . process," U.S.S.G. § 2F1.1(b)(4)(B), should not be applied to concealment of assets in a bankruptcy fraud. We have already held that the adjustment is applicable to bankruptcy proceedings, and we now join other circuits in concluding that it may be used to increase the offense level of a defendant who conceals assets in violation of the bankruptcy process. In addition, the United States cross-appeals the district court's ruling that application of the Mandatory Victim Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, which requires full restitution without consideration of the defendant's ability to pay, would violate the ex post facto prohibition because no overt acts in furtherance of the conspiracy occurred after the Act's effective date. We disagree with the district court in this case, because Kubick and Herron admitted in their plea agreements that the conspiracy continued beyond the effective date of the Act. Accordingly, we affirm the sentences, except for restitution, on which we reverse.

I

Kubick was a successful Anchorage real estate developer who experienced serious financial difficulties following the collapse of the Alaskan oil market in the mid–1980s. As the value of his real estate holdings fell, Kubick's debt (as guarantor on the loans financing his holdings) increased. He conceived a plan to conceal whatever assets he could while discharging his substantial debt in bankruptcy. To this end, he enlisted family members and friends, accountants and attorneys, including two Fort Worth, Texas attorneys, William Herron and Carol Birdwell. In the bankruptcy fraud, Kubick transferred assets to shell corporations, placed assets in

the names of friends and family, directed his coconspirators to conceal assets for him, and buried cash and diamonds to hide them from creditors.[1] Herron helped him by creating and running corporations that had no legitimate business purpose to hold assets.

Kubick filed a Chapter 7 bankruptcy petition on August 30, 1991, in Fort Worth; however, his creditors moved the venue to Alaska. He failed to disclose numerous assets that he controlled or owned, including $150,000 laundered through Herron's firm in preparation for bankruptcy, a 1991 Range Rover that was purchased for $48,-000 with money in Herron's trust account, his big game trophy collection, jewelry, furs, buried money, funds received or used by the corporate entities he created for his benefit (such as those filtered through Tinker, Inc. and Timer, Inc., which were Texas corporations used to hold $1.75 million in certificates of deposit for Kubick, and Vintage Villas, Inc., a Kubick nominee in the Adamsville Assignment), and various other properties totaling over $4.6 million in value.

On November 22, 1996, a 28 count indictment was returned against Kubick, Herron, and Birdwell. Trial was set for May 1, 1997. Knowing that he had been indicted, Kubick went to Mexico and tried unsuccessfully to negotiate a promise of pretrial release as a condition of surrender. Mexico eventually revoked his passport and Kubick was returned to Alaska in April of 1997. Trial was reset for October 1. On September 17, 1997, Herron pled guilty to counts I (conspiracy to commit bankruptcy fraud) and 28 (conspiracy to impede and impair the IRS), and Birdwell pled guilty to count 28. Kubick followed suit on September 19, 1997 by pleading guilty to counts 1 and 28.

The district court sentenced Kubick to 58 months in prison. Three aspects of the sentencing are relevant on appeal. First, the district court denied a U.S.S.G.

§ 3E1.1(b) third level reduction for acceptance of responsibility because Kubick's stay in Mexico was so protracted that he did not timely provide information or timely notify authorities of his intention to plead guilty such that the government could benefit from it. Second, Kubick's sentence was enhanced by four-levels for his leadership role in an "otherwise extensive" criminal activity. See U.S.S.G. § 3B1.1(a). And third, the district court found that Kubick's fraud upon the bankruptcy court warranted a two-level enhancement under U.S.S.G. § 2F1.1(b)(4)(B).

Herron was sentenced to 36 months in custody. His offense level was also increased by two levels for violation of a judicial process under U.S.S.G. § 2F1.1(b)(4)(B), and by another two levels under U.S .S.G. § 3B1.3 for "use of a special skill" in concealing Kubick's assets. The district court refused to award a two-level reduction for a "minor" role in the conspiracy. See U.S.S.G. § 3B1.2. Finally, the court held Herron accountable for loss to creditors caused by concealment of three assets (the $48,000 used to buy the Range Rover; the $150,000 transferred from his trust account to Kubick's Anchorage lawyers for Kubick; and the Adamsville real estate partnership interest) on the ground that Herron's involvement in each was relevant conduct. See U.S.S.G. § 2F1.1.

The court initially ordered Kubick to pay $600,000 in restitution pursuant to the MVRA and Herron to pay $150,000. Acting sua sponte pursuant to Federal Rule of Criminal Procedure 35(c), the court held that applying the MVRA violated the Ex Post Facto Clause of the United States Constitution, Art. I, Sec. 9, cl. 3, because the illegal acts upon which restitution was based had occurred prior to the MVRA's effective date of April 24, 1996. Accordingly, it invoked pre-MVRA law, 18 U.S.C.

---

1. The issues on appeal focus on the bankruptcy fraud rather than the tax fraud, because the bankruptcy fraud led to a higher guideline adjusted offense level after grouping with the tax fraud.

§ 3663, exercised discretion in light of the need for rehabilitation and ability to pay, and resentenced Kubick to make restitution in the amount of $24,000 and Herron, $6,000.

Both Kubick and Herron timely have appealed their sentences (except restitution), and the government has cross-appealed the order of restitution.

## II

We turn first to the application ˙ of U.S.S.G. § 2F1.1(b)(4)(B),[2] which authorizes a two-level increase to the base offense level for fraud if the offense involved "violation of any judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines." The district court held that there was a judicial process underway, the bankruptcy proceeding, and that Kubick and Herron each acted to conceal assets in that process. Both argue that application of this enhancement is improper where, as here, the defendant did not violate any specific order, decree, summons or subpoena directed at him. Even if applicable to concealing assets, Herron contends that the adjustment can only be applied to the debtor, not to a third-party who assists the debtor, and that in any event his own role in the bankruptcy fraud was already taken into account when the district court enhanced his sentence for use of his special skill as an attorney.

## A

■ Although we have never considered whether § 2F1.1(b)(4)(B) applies to concealment of assets in a bankruptcy proceeding, we have held that it does apply to specific adjudicatory processes, such as bankruptcy proceedings, not addressed elsewhere in the guidelines. *See, e.g., United States v. Welch,* 103 F:3d 906 (9th Cir.1996). In *Welch,* the defendant participated in a scheme to defraud the bankruptcy court by preparing and filing fraudulent bankruptcy petitions for ten-

ants facing eviction in order to invoke the automatic stay against eviction. The district court found that Welch violated the judicial process of the bankruptcy courts when she filed these false petitions. Like Kubick and Herron, Welch argued on appeal that she did not violate any judicial process because the word "process" refers only to a summons, complaint or writ, not a specific adjudicatory process. We rejected this argument, instead endorsing the Eighth Circuit's conclusion in *United States v. Lloyd,* 947 F.2d 339 (8th Cir. 1991), that the two-level enhancement under § 2F1.1(b)(3)(B) applies to a defendant who fraudulently concealed assets from the bankruptcy court. As we explained, "[t]hough the defendant 'did not violate a specific judicial order, injunction, or decree,' he 'did violate a judicial process by fraudulently concealing assets from bankruptcy court officers.'" *Welch,* 103 F.3d at 908 (quoting *Lloyd,* 947 F.2d at 340).

Kubick maintains that *Welch* is distinguishable in that it involved proceedings that were fraudulent from their inception, and the defendant there was not subject to the bankruptcy court's orders and decrees since she was neither the debtor nor a creditor. We do not agree. Even though Welch worked outside the system to help persons fraudulently become debtors, our determination that § 2F1.1(b)(3)(B) applies turned on the effect of the defendant's conduct on the bankruptcy process, not on her status. Indeed, we specifically embraced *Lloyd,* where the defendant was the debtor. Nor do we see how it matters that the petition was itself the fraud in *Welch,* whereas here the fraud is based on concealment of assets in the context of an ongoing bankruptcy proceeding. Kubick's abuse of the bankruptcy process was equally fraudulent from the beginning.

Kubick submits that whether or not *Welch* is distinguishable, it was wrongly decided. In his view, *Welch* misinterpret-

---

**2.** Formerly codified as U.S.S.G. § 2F1.1(b)(3)(B). All of the case law we cite in this section refers to this guideline under its former codification.

ed prior Ninth Circuit precedent, *United States v. Linville*, 10 F.3d 630 (9th Cir. 1993), and we should therefore disregard its holding that a bankruptcy proceeding is a judicial "process" within the meaning of § 2F1.1(b)(3)(B). We disagree. In *Linville*, the district court had determined that administrative warnings from the USDA notifying the defendant that she was impermissibly selling dogs and cats to USDA licensed dealers without a license constituted "administrative process" within the meaning of § 2F1.1(b)(3)(B). *Id.* at 632. We reversed, contrasting cases such as *Lloyd*, where a specific adjudicatory process had been initiated and violated, with "relatively informal missives" from administrative agencies. *Id.* at 632–33. In this context we held that "process must be construed to be a directive based upon the kind of formalities that undergird orders, injunctions and decrees," and that administrative notices do not rise to the level of "administrative process." *Id.* at 633. However, as we explained in *Welch*, bankruptcy proceedings involve just "the kind of formalities that undergird orders, injunctions and decrees." *Welch*, 103 F.3d

at 908 (citing *United States v. Michalek*, 54 F.3d 325, 332 (7th Cir.1995) (quoting *Linville*, and holding that § 2F1.1(b)(3)(B) applies to concealing assets in bankruptcy)). It follows that the enhancement was properly applied to concealment of assets in Kubick's bankruptcy proceeding.

A majority of the circuits to address the issue have also concluded that § 2F1.1(b)(4)(B) applies to the concealment of assets in a bankruptcy proceeding.[3] The Seventh Circuit in *Michalek* summarized the reasons well:

Although expressing its views in an abbreviated per curiam opinion, the Court of Appeals for the Eighth Circuit put its collective finger on this essential concept [the difference between bankruptcy proceedings and other types of litigation] when it pointed out that the defendant had "sought protection from his creditors under the shelter of bankruptcy" and then had "abused the bankruptcy process and hindered the orderly administration of the bankruptcy estate by concealing assets." A bankruptcy proceeding is not just another transitory cause of action that serves to adjudicate

**3.** See *United States v. Guthrie*, 144 F.3d 1006, 1010 (6th Cir.1998) (holding that concealment of assets in a bankruptcy proceeding warranted an enhancement because "bankruptcy proceedings are a judicial process as envisioned by § 2F1.1(b)(3)(B) and, thus, the enhancement applies to any scheme to defraud or violate the bankruptcy system"); *United States v. Saacks*, 131 F.3d 540, 546 (5th Cir.1997) (holding that concealment of assets in a bankruptcy proceeding warranted an enhancement under § 2F1.1(b)(3)(B) because, "even when the fraudulent debtor takes the very first act by filing his petition in bankruptcy, he is acting subsequently to the previously adopted and promulgated standing orders and standard forms, all of which command complete and truthful disclosure"); *United States v. Messner*, 107 F.3d 1448, 1457 (10th Cir.1997) (holding that concealment of assets in a bankruptcy proceeding warranted an enhancement because "a debtor violates the spirit as well as the purpose of bankruptcy" by concealing assets); *Michalek*, 54 F.3d at 331–32 (holding that § 2F1.1(b)(3)(B) applies to concealment of assets in bankruptcy proceeding and rejecting the argument that it punishes the defendant twice for the same

core conduct); *United States v. Bellew*, 35 F.3d 518, 520 (11th Cir.1994) (holding that "the concealment of assets in a bankruptcy proceeding amounts to a violation of a 'judicial order within the meaning of [§ 2F1.1(b)(3)(B) ]' "); *Lloyd*, 947 F.2d at 340 (holding that § 2F1.1(b)(3)(B) applied where defendant "did not violate a specific judicial order, injunction, or decree," but "did violate a judicial process by fraudulently concealing assets from bankruptcy officers"). *But see United States v. Shadduck*, 112 F.3d 523, 529–31 (1st Cir.1997) (holding that concealment of assets in a bankruptcy proceeding was not a violation of a "judicial order" under § 2F1.1(b)(3)(B) and declining to address the issue of whether it amounted to violation of a "judicial process" under that provision); *United States v. Carrozzella*, 105 F.3d 796, 800–01 (2d Cir.1997) (holding that attorney's conduct in filing false accounts with state probate court did not fall under § 2F1.1(b)(3)(B) because the conduct was "addressed elsewhere" in the guidelines and noting, in dicta, that "judicial process" only applies to "orders specifically directed to a defendant").

the rights and obligations of individuals. It is a special procedure by which the debtor seeks the protection of federal law from his creditors. In order to gain that protection, he must submit his property to the jurisdiction and active supervision of the bankruptcy court which acts through its trustee. As our colleague Judge Selya of the First Circuit has noted, the broad grant of jurisdictional authority, combined with the operation of the automatic stay provision, 11 U.S.C. § 362, provides the court and its trustee with the authority and the responsibility to administer the assets of the bankrupt estate.

. . .

The Eighth Circuit's view that fraudulent representations to the bankruptcy court and its trustee violate the judicial "process" of the court is consistent with the realities of bankruptcy practice. Even if we were to depart from that view, however, the imposition of the enhancement would still be appropriate. The falsehoods submitted by the defendant to the court were, as the Court of Appeals for the Eleventh Circuit has pointed out in *United States v. Bellew*, 35 F.3d 518 (11th Cir.1994), in direct violation of the requirements of the rules and forms of the Bankruptcy Rules to declare truthfully all assets and liabilities. In a bankruptcy adjudication, this requirement is, as the Eleventh Circuit pointed out, "in the context of formal, adversary court proceedings."

*Michalek*, 54 F.3d at 332–33 (citations omitted). In sum, there is no more basic a command than to come clean and truthfully declare all assets and liabilities in bankruptcy. Not to do so violates the heart of the process.

■ Thus, the § 2F1.1(b)(4)(B) enhancement appropriately applies to concealment of assets in a bankruptcy proceeding. Nevertheless, Kubick submits, use of the enhancement here derogates the structure of the guidelines because he did not demonstrate the aggravated criminal intent that the enhancement was intended to reach. Offenses involving fraud or deceit are assigned a base offense level of 6 under § 2F1.1, but this offense level is generic, covering all possible types of fraud. Specific offense characteristics such as those identified in § 2F1.1(b)(4)(B) for violation of a judicial process recognize the different nature, extent and severity of the conduct to be punished in the particular case. Kubick correctly notes that the commentary to § 2F1.1 indicates with respect to this enhancement that "[a] defendant who has been subject to civil or administrative proceedings for the same or similar fraudulent conduct demonstrates aggravated criminal intent and is deserving of additional punishment for not conforming with the requirements of judicial process or orders issued by federal, state, or local administrative agencies." U.S.S.G. § 2F1.1, Background. He points out that he had never been subject to such proceedings prior to engaging in the acts for which he was convicted, and for this reason, he argues, he could not "demonstrat[e] aggravated criminal intent" over the ordinary fraud case. *Welch*, however, also disposes of this argument, for as we noted of the defendant in *Welch*, Kubick's "abuse of the bankruptcy process makes [him] more culpable, and thus distinct from, others who have committed offenses under § 2F1.1." *Welch*, 103 F.3d at 908 (quoting *United States v. Cheek*, 69 F.3d 231, 233 (8th Cir.1995) (citing *Michalek*, 54 F.3d at 332 n. 12)). His sentence for bankruptcy fraud was, therefore, properly enhanced.

**B**

■ Herron's position is somewhat different and at odds with Kubick's, in that he argues that even if § 2F1.1(b)(4)(B) applies to bankruptcy proceedings, the enhancement cannot apply to non-debtors. He posits that the logic behind § 2F1.1(b)(4)(B), and the cases we have noted that apply it to concealment of assets, indicates that this section is applicable only to the person who has actually subjected himself to the "process" of the bankruptcy court by filing a petition and

seeking the protections of the court. Because he was not a party to Kubick's bankruptcy, Herron contends, this quid pro quo arrangement cannot apply. However, in *Welch* the defendant was not herself a debtor, yet we upheld the enhancement. *See also United States v. Webster*, 125 F.3d 1024, 1036 (7th Cir.1997) (relying on *Welch* to uphold a § 21F1.1(b)(3)(B) enhancement for the debtor's attorney, who argued that "he violated no judicial or administrative order ... and had no reason to knowingly abuse the bankruptcy process or knowingly hinder the orderly administration of the bankruptcy estate by concealing assets."). Although he was not Kubick's bankruptcy attorney and did not prepare Kubick's bankruptcy petition, Herron falsely testified in the proceeding and admitted in his plea agreement that he assisted Kubick in the concealment of assets. This suffices for application of § 2F1.1(b)(4)(B).

■■■ Alternatively, Herron argues that this enhancement constitutes impermissible "double counting" because his offense level was also adjusted upward by two-levels under § 3B1.3 for use of "a special skill, in a manner that significantly facilitated the commission or concealment of the offense." [4] Impermissible double counting occurs " 'where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines.' " *United States v. Darres Chin–Sung Park*, 167 F.3d 1258, 1261 (9th Cir.1999) (quoting *United States v. Willett*, 90 F.3d 404, 407 (9th Cir.1996)). As an attorney, Herron qualifies as "specially skilled," U.S.S.G. § 3B1.3, Application Note 3, and his license to practice law enabled him easily and inconspicuously to create shell corporations so that Kubick could deceive the bankruptcy court by secreting assets. Herron contends that the rationale upon which the "use of special skill" adjustment is based is the same as for the violation of judicial process enhancement, but we do not see it that way in this case.

Although Herron's different acts, broadly speaking, were to the same end—concealment of Kubick's assets—double counting is not implicated because apart from the things that Herron did as a lawyer, such as creating shell corporations, he gave perjured testimony in the bankruptcy proceeding. The harm from perjurious testimony is different from (and beyond) harm to the process by helping to conceal assets. Section 3B1.3 recognizes and punishes the heightened culpability of an attorney who uses his special skill for a criminal purpose, whereas § 2F1.1(b)(4)(B) increases punishment for fraud when the defendant has violated a judicial process. As these are distinct harms, double counting did not occur.

### III

The district court denied Kubick a third level reduction for acceptance of responsibility under § 3E1.1(b) because it found that he hid out in Mexico for so long that he did not timely provide information or timely notify the authorities of his intention to plead guilty such that the government could benefit from it, and that this contributed to a delay in the trial for his co-defendants as well. Kubick challenges this decision for relying, even in part, on his stay in Mexico and on inconvenience to co-defendants in the absence of any finding that the government had begun trial preparation, or that the court was prevented from allocating resources efficiently.

4.  Section 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or spe-

cific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

Section 3E1.1(b) provides a third level reduction if the defendant "timely provides complete information to the government concerning his own involvement in the offense" or "timely notifies authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." A three-level reduction is mandatory if the defendant meets either of the two bases in § 3E1.1(b). *See United States v. Villasenor-Cesar*, 114 F.3d 970, 973 (9th Cir.1997). The defendant bears the burden of proof, *see United States v. Ladum*, 141 F.3d 1328, 1348 (9th Cir.1998), and we review the district court's decision for clear error. *See United States v. Kimple*, 27 F.3d 1409, 1412 (9th Cir.1994).

Kubick maintains that denying the additional level adjustment impermissibly penalized him for exercising his international treaty rights while he was in Mexico. However, he never claimed or exercised any right under the United States–Mexico extradition treaty, Jan. 25, 1980, United States–Mexico, 21 U.S.T. 5059, in Mexico or in the district court. Nor does he point to anything in the treaty that entitled him to stay in Mexico to broker a deal for a conditional return to the United States. Therefore, denying the reduction could not (and did not) punish the exercise of any right that was not illusory.

Neither are we persuaded by Kubick's argument that his failure to accept the government's August 5 plea offer within the two week period for which it was extended could not constitutionally be held against him because he was attending a material witness examination in Arizona at the time, and his counsel advised him to wait until returning to Alaska to finalize the plea agreement. Nothing in the rec- ord suggests that Kubick was unable to consult with counsel at any time.

Regardless, Kubick contends, the government's trial preparation was not affected for it did not really begin until after the material witness deposition in August, and his delay in entering a plea did not delay the trial of Herron and Birdwell, who had themselves asked for several continuances because of the case's complexity—not Kubick's absence. We are not firmly convinced of error in either respect. Kubick did not sign a plea agreement until September 19, 1997, thirteen days before trial. By then, the government had taken a material witness deposition, hired artists to create charts, subpoenaed over a hundred witnesses, brought in a tax attorney from Washington D.C., and filed a set of proposed instructions. Although the trial might have been continued anyway, Kubick's stay in Mexico contributed to delay because he obviously could not participate in any proceedings while he was there. As a whole, Kubick's plea did not "occur particularly early in the case," did not permit the government to "avoid preparing for trial," and did not allow the district court to "schedule its calendar efficiently." U.S.S.G. § 3E1.1, Application Note 6. As Kubick has the burden of proof, we therefore cannot say that the court clearly erred in denying the third level adjustment.

## IV

Kubick argues that application of a four-level upward adjustment for an aggravating role as the leader of a criminal activity that was "otherwise extensive" under § 3B1.1(a) was invalid because he did not exercise authority over at least one criminally culpable participant. This is not correct, for the district court found that Kubick directed and manipulated Herron, who pled guilty, as well as Birdwell and others.[5] This finding is amply

---

5. Kubick questions whether the district court made the necessary finding under Federal Rule of Criminal Procedure 32(c)(1) that he exercised control and authority over either Herron or Birdwell given his objection to the same finding in the Presentence Report, how- ever it seems quite clear from the ruling, after argument, that the district court was adopting the PSR and concluding on its own that "Kubick ... directed and manipulated his lawyers." In any event, Kubick admitted that he directed Herron to create Tinker, Inc. and

supported in the record. The criminal activity that Kubick orchestrated and from which he primarily benefitted spanned eight years and several states; included attorneys, friends, accountants, his daughter and his wife, all of whom he recruited; and involved the sham ownership of numerous properties, millions of dollars in assets, and laundering of proceeds to Kubick through a Mexican company. It was plainly extensive, and the district court was not clearly erroneous in adjusting Kubick's offense level upward on account of it. *See United States v. Avila,* 95 F.3d 887, 889 (9th Cir.1996) (application of leadership adjustment reviewed for clear error).

## V

Herron claims that he should have received a mitigating role adjustment under § 3B1.2(b) for his minor role in the bankruptcy and tax fraud perpetrated by Kubick, essentially on the footing that he was a "hired hand" whose concealment of assets was significantly less than Kubick's. While it may be that Herron was less culpable than Kubick, the court found that he was more culpable than Birdwell and other participants. We are not firmly convinced this is wrong, for Herron used his trust account to channel monies to Kubick, perjured himself in Kubick's bankruptcy, set up the Tinker and Timer corporations, and was actively involved in the Independence Park and Wyoming properties. *See United States v. Ladum,* 141 F.3d at 1348 (finding that defendant does not qualify for minor participant status will be upheld unless clearly erroneous).

## VI

Herron contends that the district court erred by including non-fraudulent "relevant conduct" in determining the value of loss for purposes of the fraud guideline, U.S.S.G. § 2F1.1. He specifically points to $150,000 that he transferred to Bankston & McCollum's trust account in

Anchorage for Kubick's use before bankruptcy, arguing that the loss of these funds was not fraudulent because consumption of this asset did not violate bankruptcy law and was not a criminal act; purchase of a $48,000 Range Rover that Kubick disclosed in bankruptcy (although he misrepresented its value); and $600,000 attributed to the Adamsville Assignment in which Herron claims his role was minimal. We disagree that these items were not properly considered. Herron's plea admitted that he conspired to commit bankruptcy fraud, which includes concealing property "in contemplation of a case under title 11" by another person. 18 U.S.C. § 152(7). In the case of jointly undertaken criminal activity, "relevant conduct" includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken activity" that occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B).

Herron ran $198,000 through his law firm trust account at Kubick's direction. Herron used $48,000 of these funds to buy a Range Rover for Kubick (who apparently gave it to his daughter) and admitted that he helped Kubick conceal this money at a time when Kubick contemplated filing for bankruptcy. Also, a few months before filing, Herron wire-transferred the balance of $150,000 to Kubick's Anchorage law firm; Kubick used these funds to remodel office space and to buy horses and boats. Neither Herron's trust account nor the Alaska law firm's account to which the $150,000 was transferred was disclosed in Kubick's bankruptcy; the Range Rover was disclosed as an asset, though not at $48,000. Given how Herron handled the $198,000 worth of Kubick's money in his trust account, we cannot say that the district court clearly erred in finding that the

---

Timer, Inc. and that he directed Herron, Birdwell, and at least eight other friends or

family members to help him hide assets.

diversion of these funds was in preparation for the bankruptcy fraud offense.[6]

■ Nor was the "Adamsville Assignment" improperly included as relevant conduct. The Adamsville Assignment involved several different shell corporations that were used to conceal Kubick's real estate interests in Alaska. Herron's plea admitted that he assisted in Kubick's efforts to conceal Kubick's actual ownership and control of properties in the Adamsville Assignment, including specifically Vintage Villas. However, Herron maintains, his involvement was minimal and he should not be accountable for the entire $600,000 loss attributable to the Adamsville Assignment. In reality only two of the assets owned by these entities were counted for purposes of calculating loss, Devonshire and Strawberry Meadows. Herron was adequately tied to the Devonshire and Strawberry Meadows transactions: He wrote a letter misrepresenting the ownership of Vintage Villas (a Kubick nominee for which he said he was general counsel), which was a major shareholder of Devonshire and a minor contributor in the Strawberry Meadows property; and he was the largest personal contributor to the Strawberry Meadows property. Thus, the paper trail supports the district court's determination.

## VII

■ On cross-appeal, the government argues that the district court erred in holding that application of the Mandatory Victim Restitution Act of 1996, 18 U.S.C. § 3663A, was barred by the Ex Post Facto Clause of the United States Constitution, Art. I, Sec. 9, cl. 3. Unlike prior restitution law under which a court had discretion to consider the defendant's financial condition before setting the amount of restitution to be paid, the MVRA requires courts to impose "full" restitution without considering the defendant's economic circumstances for offenses involving fraud or deceit. See 18 U.S.C. § 3663A(c)(1)(A)(ii); 18 U.S.C. § 3664(f)(1)(A). It went into effect April 24, 1996. At sentencing, the court applied the MVRA and ordered Kubick to pay restitution of $600,000 (comprised of the $150,000 laundered in May of 1991 and the $450,000 in cash that Kubick hid in the 1980s), and Herron to make restitution in the amount of $150,000 (also for the May 1991 laundering). Neither contested application of the MVRA, however the district court, acting sua sponte a few days later under Federal Rule of Criminal Procedure 35(c), ruled that application of the MVRA was barred by the ex post facto prohibition because these particular acts occurred prior to April 24, 1996.

The government argues that the district court erroneously focused on the timing of specific events which occurred prior to the effective date of the MVRA, rather than on the period of the conspiracy, which extended beyond the effective date of the MVRA. Here, the plea agreements expressly acknowledge that Kubick and Herron participated in a conspiracy that began on or about January 1990 and continued until at least August 1996. Kubick maintains that the adverse substantive change to the restitution statute may not be applied, even in a conspiracy case, to losses caused by conduct that occurred prior to the change. But, as we have previously held, restitution can be based on the amount of damages caused by an entire scheme that is in the nature of a conspiracy rather than only in the amount caused by a particular act. For this reason, "we should not focus on particular [acts] to determine exactly when the victims' losses occurred. Rather, we look to the duration of the entire fraudu-

---

6. Herron suggests that the court held him accountable for the $48,000 loss on the ground that he set the wheels in motion For Kubick's lie about the source of funds used to buy the Range Rover and the amount of Kubick's own contributions to the purchase, but in fact the sentencing judge ruled that the

$48,000 should be included "for exactly the same reasons I included the entire one hundred and fifty thousand dollars. This is something that's relevant conduct. This was done in preparation for the filing of the bankruptcy, and it is also something that Mr. Herron participated in along with Mr. Kubick...."

lent scheme." *United States v. Angelica,* 859 F.2d 1390, 1393 (9th Cir.1988) (upholding restitution for losses that occurred in a mail and wire fraud scheme before the effective date of the Victim and Witness Protection Act that continued beyond the effective date); *United States v. Smith,* 944 F.2d 618, 621 (9th Cir.1991) (same); *see also United States v. Reed,* 80 F.3d 1419, 1423 (9th Cir.1996) (recognizing that courts may order restitution for acts of related conduct when the defendant is convicted of a conspiracy offense).

■ Kubick relies on *United States v. Mussari,* 152 F.3d 1156 (9th Cir.1998), where we held that it was a violation of the Ex Post Facto Clause to ground a conviction on instances of the defendant's failure to pay child support that predated the effective date of the applicable statute, but his reliance is misplaced. Although *Mussari* involved a continuing offense, the offense was not a conspiracy; when, as here, the offense is a conspiracy, restitution may be ordered for losses attributable to acts that occur before and after the effective date of the applicable statute.

■ It is well settled in this circuit that "a statute increasing a penalty with respect to a criminal conspiracy which commenced prior to, but was continued beyond the effective date of the statute, is not *ex post facto* as to that crime," *United States v. Campanale,* 518 F.2d 352, 365 (9th Cir.1975) (citing cases), and that "[c]onspiracy is a continuing offense, which is charged and punished as one crime from beginning to end. The crime of conspiracy is entirely separate from the completed substantive offenses committed pursuant to the conspiracy, and it is appropriately punished as a separate offense." *United States v. Inafuku,* 938 F.2d 972, 973–74 (9th Cir.1991) (citation omitted). In *Inafuku,* the defendant raised an ex post facto challenge to aggregation of amounts of contraband distributed before and after the effective date of a mandatory minimum sentencing statute that turned on the amount of methamphetamine involved in the conspiracy. We held that applying the

standards in effect at the point at which the conspiracy terminated, in order to punish the defendant for conspiracy to distribute the entire amount of contraband actually involved in the conspiracy, does not violate the prohibition against ex post facto laws. *See id.* at 974. It follows that ordering "full" restitution on assets concealed during the course of the conspiracy to commit bankruptcy fraud, which did not end until after the MVRA's effective date, does not offend ex post facto principles.

Kubick contends that the district court's ruling should be affirmed because the conspiracy ended earlier, in 1993, when the bankruptcy court denied discharge under Title 11. He reasons that overt acts are meaningful only if within the scope of the conspiratorial agreement, the agreement here was to conceal assets and submit false documents in Kubick's bankruptcy proceeding, and the concealment continued only until the bankruptcy discharge was denied on May 18, 1993. However, Kubick moved to set aside this order, and the matter was not finally adjudicated until September 22, 1998, when the motion to set aside was denied. That this order confirmed the denial of discharge originally entered in May of 1993 does not have the effect, as Kubick seems to suggest, of wiping out everything that happened after May 18, 1993.

■ Kubick further submits that regardless of the pro forma averments of the indictment, the conspiracy must have ended sometime before April 24, 1996 because nothing in the factual basis for the plea, or in the exhibits, and nothing in the Presentence Report alleges an act of concealment of assets thereafter. *See, e.g., Leyvas v. United States,* 371 F.2d 714, 717 (9th Cir. 1967) (noting that continuing criminal conspiracies which must be evidenced by overt acts are regarded as having been committed on the date of the last overt act). For us to accept this point, however, we would have to disregard the plea agreement and this we cannot do. A guilty plea "conclusively admits all factual allegations of the

indictment," *United States v. Mathews*, 833 F.2d 161, 163 (9th Cir.1987) (quoting *United States v. Benson*, 579 F.2d 508, 509 (9th Cir.1978)), and here, Kubick conclusively admitted the factual allegation in the indictment that the conspiracy continued until at least August 1996.

█ Finally, Kubick argues that the order can also be affirmed on the alternative ground that the court failed to advise him about any restitutionary penalty in connection with his Rule 11 proceedings. The government concedes error, but points out that we have recently held that the failure to give notice of potential restitution does not affect substantial rights, and is therefore harmless error, where the defendant is advised that a fine in excess of the amount of restitution could be imposed. *See United States v. Crawford*, 169 F.3d 590, 592–93 (9th Cir.1999). As the district court did advise Kubick that he was subject to a fine of up to $250,000 for each offense, restitution up to $500,000 would be proper under *Crawford* as to him.[7]

Accordingly, we reverse the orders of restitution and remand for the district court to apply the MVRA. It may not, however, order Kubick to make restitution exceeding $500,000.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

---

7. Herron's restitution under the MVRA, $150,000, is well below the ceiling for a fine, about which he, too, was advised.